COMMONWEALTH of Kentucky,
Appellant/Cross–Appellee

v.

Janice HASCH, Appellee/Cross–Appellant.

Nos. 2010–SC–000494–DG,
2011–SC–000232–DG.

Supreme Court of Kentucky.

Sept. 26, 2013.

Rehearing Denied March 20, 2014.

Jack Conway, Attorney General of Kentucky, James Coleman Shackelford, Assistant Attorney General, Counsel for Appellant/Cross–Appellee.

Sarah Bash Brian, G. Murray Turner, Turner, Coombs & Malone, PLLC, Counsel for Appellee/Cross–Appellant.

Opinion of the Court by Justice
VENTERS.

Appellee/Cross–Appellant, Janice R. Hasch (Appellee) was indicted for murder and tried in the Bullitt Circuit Court for the shooting death of her husband, Jerald Hasch, in April 2008. Appellee admitted that she killed her husband but claimed that she was acting in self-defense. The jury acquitted her of the murder charge but found her guilty of the lesser offense of reckless homicide and sentenced her to two years' imprisonment. She appealed. The Court of Appeals concluded that the evidence was not sufficient to sustain a reckless homicide conviction. It concluded that the trial court had erred by instructing the jury on that offense, and accordingly it reversed the conviction.

We granted the Commonwealth's motion for discretionary review to consider, *inter alia*, whether the reckless homicide instruction was properly given in this case, in light of the 2006 revisions of KRS Chapter 503 codifying a form of the common law "no duty to retreat" rule, and whether evidence that Appellee could have retreated or escaped from the incident without resorting to deadly force was properly admitted into evidence as a factor for the jury to consider in determining the reasonableness of her belief. For the reasons set forth below, we reverse the Court of Appeals and reinstate the judgment of the Bullitt Circuit Court. We also review issues raised by Appellee on cross-appeal, which because of its disposition of the case, the Court of Appeals declined to address.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The central issue before this Court arises out of the Commonwealth's contentions that Appellee's reckless homicide conviction was supported by the evidence and that the Court of Appeals erred by concluding otherwise. Appellee argued at trial and on appeal that the only verdicts that could be sustained by the evidence were guilty of murder or an acquittal

based upon the theory that she acted in self-defense.

Appellee and her husband, Jerald Hasch, had endured several incidents of marital discord, including at least two calls to law enforcement officials for emergency assistance. Appellee claimed that on a number of occasions Jerald had hit her and inflicted physical injury upon her. The final altercation occurred on April 14, 2008, when Appellee reported to the 911 operator that she had shot her husband and needed advice on what to do to keep him alive until emergency medical personnel arrived. Whatever effort she rendered to save him proved to be ineffective. Jerald died from the gunshot that struck him between his eyes.

As a result of the shooting, Appellee was charged with murder. The only direct evidence of the events leading up to the shooting came from Appellee's trial testimony and from earlier statements that she made to police during their investigation of the shooting. According to that evidence, Appellee was cleaning and organizing a bedroom closet when she found a small caliber handgun that Jerald had misplaced. She took the gun, still in its case, into the living room to show Jerald that she had found it. Appellee testified that Jerald suddenly became angry and demanded to have possession of the gun. Appellee refused, fearing that if he got the gun he would use it to harm her. Jerald lunged toward her aggressively and pushed her down as he tried to grab the gun from her hand. They struggled about the house, from the living room and into the kitchen, until Appellee backed herself into the bedroom and shut the door. Jerald, who was still unarmed, forced the bedroom door open and continued his effort to get the gun. Appellee continued to resist his demand. According to Appellee, Jerald finally taunted her by saying that if she intended to use the gun against him, "you better put it between my eyes and shoot me." He moved toward her in a threatening manner, causing her to believe that he intended to kill her. She backed away from him and removed the gun from its case. She inserted the magazine and pointed the weapon toward Jerald. She then closed her eyes because "she could not bear to think of what was about to happen," and she fired the gun.

The bullet struck Jerald's face between the eyes from a distance of less than twenty-four inches. Appellee is an experienced marksman. She and the Commonwealth both agree, and the evidence is undisputed, that she intended to shoot Jerald when she pulled the trigger. Appellee claims, however, that she acted in self-defense but without a specific intention to kill him.

The police looking about the house saw no evidence of the kind of struggle that Appellee described, casting doubt upon her story. At trial, the Commonwealth's theory was that no physical struggle had occurred, that Appellee did not believe she was in danger of physical harm from Jerald, and that she intentionally killed Jerald by shooting him in the face at close range.

Shortly after the shooting, and in response to intense questioning by a police detective, Appellee acknowledged that instead of shooting Jerald, she "could have gone out the door," and that she "could have left [the house]" as she had done during previous altercations. These statements were admitted at trial over her objection. In her trial testimony, Appellee attempted to clarify the statement by saying that she meant that she could have left the house *before* Jerald became angry, but not *immediately* before the shooting. She testified that by the time the fray reached the point at which she believed she was in imminent danger, she had backed into the bedroom and Jerald was blocking her path

to the door. She testified that "he would never let me leave again." The Commonwealth argued at trial that this evidence was relevant because Appellee's conscious decision to bypass a route of escape and stay in her home indicated that she knew at the time of the shooting that deadly force was not necessary.

At the close of all the evidence, and after the trial court denied her motion for a directed verdict of acquittal, Appellee argued to the trial court that the evidence did not support an instruction on any of the lesser homicide offenses. She insisted the only verdicts that could be sustained under the evidence were guilty of murder or not guilty by reason of self-protection. Nevertheless, the trial court instructed upon the full range of homicide offenses: specifically, intentional and wanton murder (KRS 507.020) with the self-protection defense and the wanton/reckless belief (imperfect self-defense) qualification; first-degree manslaughter (KRS 507.030); second-degree manslaughter (KRS 507.040); and reckless homicide (KRS 507.050). Within the self-protection instruction, the trial court provided the jury with the following "no duty to retreat" instruction, based upon KRS 503.055(3):

> You are further instructed that if Janice Hasch was not engaged in unlawful activity and was in a place where she had a right to be, then she had no duty to retreat from Jerry Hasch and had the right to stand her ground and meet force with force, including deadly physical force if she reasonably believed it was necessary to prevent death or serious bodily harm to herself.

As indicated by the signature of the jury's foreperson on each individual verdict form, the jury expressly acquitted Appellee of murder, first-degree manslaughter, and second-degree manslaughter. The jury found her guilty of reckless homicide

and her sentence was fixed at two years' imprisonment. On appeal, the Court of Appeals concluded that the evidence did not support the lesser offense of reckless homicide and so it reversed the conviction. We reverse the Court of Appeals and reinstate the trial court's judgment convicting Appellee of reckless homicide and imposing a two-year term of imprisonment.

We begin our review with the Commonwealth's contention that the Court of Appeals erred in its conclusion that the evidence failed to support the charge of reckless homicide.

## II. THE EVIDENCE SUPPORTED APPELLEE'S CONVICTION FOR RECKLESS HOMICIDE UNDER THE IMPERFECT SELF–DEFENSE THEORY

### A. The Alternate Theories of Reckless Homicide

■ Because the jury acquitted Appellee of murder, first-degree manslaughter, and second-degree manslaughter, the only remaining issue about the instructions is whether the reckless homicide instruction was authorized by the evidence. KRS 507.050(1) provides that "[a] person is guilty of reckless homicide when, with recklessness he causes the death of another person." As this Court explained fully in *Saylor v. Commonwealth*, 144 S.W.3d 812, 819 (Ky.2004), there are two theories under which a defendant may be convicted of reckless homicide:

1) The so-called "straight" reckless homicide theory, where the defendant acts without the specific intent to kill and in doing so, fails to perceive a substantial and unjustifiable risk that his actions could cause the victim's death, *see* KRS 507.050(1) and KRS 501.020(4); and

2) The "imperfect self-defense" theory, where the defendant, with or without the specific intent to kill, acts under an *actual but mistaken belief that* he must use physical force or deadly physical force against another person in order to protect himself from imminent death or injury about to be inflicted by that person, *and in so acting he failed to perceive a substantial and unjustifiable risk that he was mistaken in his belief that force is necessary.* See KRS 501.020(4) and KRS 503.120(1).[1]

■ Under both theories of reckless homicide, the element of recklessness requires the failure to perceive a substantial and unjustifiable risk, and the failure to perceive that risk must be "a gross deviation from the standard of care that a reasonable person would observe in the situation." KRS 501.020(4). Under the straight theory of reckless homicide, KRS 507.050(1), a reckless failure to perceive the risk that the defendant's actions would result in the victim's death supplies the element of recklessness necessary to sustain a reckless homicide conviction. *Saylor,* 144 S.W.3d at 819.

■ Under the imperfect self-defense theory of reckless homicide, the defendant knows that his conduct could cause another person's death and he actually believes that the use of force is necessary to protect himself from another person. *Id.* The element of recklessness is supplied by his failure to perceive a substantial and unjustifiable risk that his belief in the need to use force is mistaken. *Id.* Again, the el-ement of recklessness requires that the failure to perceive that risk was a gross deviation from the standard of care that a reasonable person would observe in the situation. Because there was no doubt in this case that Appellee intentionally fired the fatal bullet, when the jury convicted Appellee of reckless homicide instead of murder it accepted her claim that she actually believed her use of force was necessary to prevent Jerald from hurting her. Further, it had to conclude that she was mistaken in that belief, and that she was reckless in forming that mistaken belief.

**B. The Evidence was Sufficient to Support a Conviction on Reckless Homicide Under the Imperfect Self-defense Theory, But Not Under the Straight Theory**

■ The Commonwealth argues that the trial court properly instructed the jury upon both theories of reckless homicide culpability, and that the Court of Appeals erred when it determined that the evidence was insufficient to sustain the conviction under either theory. "An instruction on a lesser included offense is required only if, considering the totality of the evidence, the jury might have a reasonable doubt as to the defendant's guilt of the greater offense, and yet believe beyond a reasonable doubt that he is guilty of the lesser offense." *Houston v. Commonwealth,* 975 S.W.2d 925, 929 (Ky. 1998). When faced with a sufficiency-of-the-evidence challenge such as the failure to grant a directed verdict on a particular crime or erroneously giving a jury in-

---

1. KRS 503.120(1) provides: "When the defendant believes that the use of force upon or toward the person of another is necessary for any of the purposes for which such belief would establish a justification under KRS 503.050 to 503.110 but the defendant is wanton or reckless in believing the use of any force, or the degree of force used, to be neces-sary *or* in acquiring or failing to acquire any knowledge or belief which is material to the justifiability of his use of force, the justification afforded by those sections is unavailable in a prosecution for an offense for which wantonness or recklessness, as the case may be, suffices to establish culpability." (emphasis added).

struction on a particular crime, the appellate court must determine whether, "after viewing the evidence in the light most favorable to the Commonwealth, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Commonwealth v. Jones,* 283 S.W.3d 665, 668 (Ky.2009); *Commonwealth v. Benham,* 816 S.W.2d 186, 187–88 (Ky.1991). Accordingly, in reviewing Appellee's claim that she was wrongfully convicted by the trial court's error in instructing upon the charge of reckless homicide, our task is to determine whether the Commonwealth presented sufficient evidence to support that conviction, just as we would if reviewing the trial court's denial of a motion for a directed verdict; that is, pursuant to the standards contained in *Benham.*

Using the foregoing standards, we conclude that the Court of Appeals correctly determined that the evidence was insufficient to sustain a conviction under the theory of straight reckless homicide. But, we further conclude that the Court of Appeals erred in its determination that the evidence did not support a conviction under the imperfect self-defense theory of reckless homicide.

## C. Straight Reckless Homicide

■ There is absolutely no doubt from the evidence presented that Appellee killed her husband by shooting him with a gun. All parties agree, and there is no evidence casting doubt upon the fact, that Appellee intentionally fired the gun knowing that it was pointed in the direction of her husband's head, which was then just a short distance from the muzzle of the gun. Appellee was skilled in the use of firearms, and she clearly understood the likely effect of pulling the trigger under the circumstances as she claimed them to be. The evidence on those points is unmistakable.

No juror could reasonably conclude otherwise.

Even if Appellee's claim that she had no specific intent to kill is true, the facts that she closed her eyes when she squeezed the trigger and did not specifically take aim at Jerald do not create any possibility that she failed to perceive the risk that death could result from her conduct. No rational juror could believe that Appellee *failed to perceive the risk* of death inherent in her conduct of firing a pistol, with or without her eyes closed, in the direction of another person at such close range. The essential element of straight reckless homicide—her failure to perceive the risk that her actions could result in another's death—is undoubtedly absent here, as the Court of Appeals correctly ascertained.

This is exactly the same rationale we applied in *Saylor,* although in *Saylor* it was the defendant rather than the Commonwealth arguing in favor of an instruction on straight reckless homicide:

> Nor did Appellant testify to anything other than an intentional killing when he testified in his own behalf. His theory of the case was that he knew [the victim] was such a dangerous and violent man that he (Appellant) had no choice but to use deadly physical force against [the victim] in self-protection. Thus, the only evidentiary basis for a conviction of manslaughter 2nd or reckless homicide was that Appellant was wanton or reckless in his belief in the need to use deadly physical force in self-protection. There was no evidentiary basis for "stand alone" [or "straight"] instructions on manslaughter 2nd or reckless homicide premised upon a theory that Appellant unintentionally killed [the victim].

*Saylor,* 144 S.W.3d at 820; *see also Hudson v. Commonwealth,* 385 S.W.3d 411, 418–19 (Ky.2012) (Defendant could not reasonably have failed to perceive the risk

of death associated with taking a police informant/victim to a remote area in the dark of night to meet criminal gang members angry about her cooperation with police.).

It was error for the trial court to instruct the jury on this theory of reckless homicide because a trier of fact could not reasonably have found beyond a reasonable doubt the essential element that distinguishes this theory of reckless homicide—Appellee's *subjective* failure to perceive the substantial risk of death that attended her action of firing the gun. It was established at trial beyond a reasonable doubt that she fired the gun intentionally, not recklessly, and that she clearly perceived the risks involved. The evidence presented at trial did not support a conviction for reckless homicide under the straight theory. We therefore agree with the Court of Appeals in that respect.

We next consider whether a jury could reasonably find that Appellee's claimed belief in the need to act in self-defense was *objectively* unreasonable so as to constitute recklessness in forming that belief, and thus support a reckless homicide conviction under the imperfect self-defense theory.

**D. The Imperfect Self-defense Theory of Reckless Homicide**

 The reckless homicide conviction can be sustained under the imperfect self-defense theory *only* if the evidence adduced at trial could lead reasonable jurors to believe beyond a reasonable doubt that Appellee failed to perceive the risk that she was mistaken in her belief that she needed to act in self-protection or in the degree of force necessary. *See Jones,* 283 S.W.3d at 668; *Benham,* 816 S.W.2d at 187. Under KRS 503.120(1), the mistaken

belief can take either of two forms. There may be a mistaken belief that force of any kind was needed. For example, one might mistake an innocent, friendly visitor for a dangerous intruder. Or, there may be a mistaken belief that deadly force rather than non-deadly force was needed for self-protection. For example, one might mistakenly believe that an unarmed aggressor was about to strike with a deadly weapon or dangerous instrument. In either case, to be "reckless," the failure to perceive the risk of being mistaken must be "a gross deviation from the standard of care that a reasonable person would observe in the situation." [2] In other words, to support a reckless homicide conviction under the imperfect self-defense theory, there must be evidence from which one could reasonably believe that when Appellee fired the gun, she mistakenly believed that she was in imminent danger of death or serious physical injury at the hands of Jerald Hasch, and that her failure to perceive the risk that she may be mistaken about the need to use force or about the degree of force required, was a gross deviation from the standard of care of a reasonable person.

 As provided by the statutory language, the "mistaken belief" component of reckless homicide under the imperfect self-defense theory is based upon the defendant's *subjective* viewpoint: a defendant must actually believe, albeit mistakenly, that the use of deadly force is necessary. But, whether the defendant's failure to perceive the risk of being mistaken was a gross deviation from the standard of care must be based upon an *objective* viewpoint—what a reasonable person would perceive in the situation. Upon application of these standards, we determine that while Appellee subjectively believed that deadly force was needed to

---

**2.** KRS 501.020(4).

protect herself, as reflected in the jury verdict acquitting her of murder, the evidence was such that a jury could reasonably conclude that she was mistaken in that belief, and that her failure to perceive the risk that she was mistaken was, *objectively*, a gross deviation from the standard of care of a reasonable person in the same situation, and was, therefore, reckless.

Because the question posed is whether the evidence supported the giving of a reckless homicide instruction, we must examine the evidence, and we do so in the light most favorable to the Commonwealth, including the inferences that might reasonably be drawn from the evidence. *Jones*, 283 S.W.3d at 668 ("[T]he question on appeal is whether, after viewing the evidence in the light most favorable to the Commonwealth, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."). Upon our review, we agree with the Commonwealth's contention that the evidence was sufficient to warrant a reckless homicide instruction.

In her initial statement to police, Appellee said only that Jerald had pushed her before she shot him. He had no weapon, and Appellee did not claim to believe that he had a weapon. Police found no evidence about the home to support the kind of physical altercation that Appellee described. Appellee had no visible scratches or bruises to support her story that Jerald was forcefully attacking her. A rational juror could therefore have easily believed beyond a reasonable doubt that Appellee subjectively believed that Jerald was about to inflict death or serious injury upon her, but that (from an objective standpoint) she was reckless in her failure to perceive the risk that her belief was mistaken. Nothing in her explanation of the shooting or in the circumstantial evidence surrounding it

suggested that Appellee entertained any doubt about Jerald's intentions or otherwise pondered the possibility that she might be mistaken in her belief. For that reason, a rational juror could have readily concluded that Appellee shot Jerald without cautiously assessing the accuracy of her belief, and that doing so was a gross deviation from the standard of care that a reasonable person would have observed in that situation.

The evidence very plainly authorized an instruction on the imperfect self-defense theory of reckless homicide and, accordingly, it adequately supports the verdict. The trial court properly instructed the jury on that theory of the offense. The Court of Appeals erred when it held otherwise, and we consequently reverse its dismissal of the reckless homicide conviction. We note further that our conclusion that the evidence was sufficient to authorize a reckless homicide instruction does not depend upon the challenged evidence that Appellee could have escaped, or retreated, from the scene without resorting to violence. Even without that testimony, the evidence was plainly adequate to sustain the conviction. Nevertheless, in support of the Court of Appeals' decision, Appellee argues that the evidence of her ability to escape before resorting to the use of deadly force, and the prosecutor's comments thereon, improperly encouraged the jury to disregard Appellee's right under KRS 503.055(3) to stand her ground. Thus, we find it appropriate to examine the admissibility of such evidence to ascertain whether the Appellee was unduly prejudiced by its admission in this case.

## III. CODIFICATION OF THE "NO DUTY TO RETREAT" DOCTRINE

In 2006, the legislature amended several parts of KRS Chapter 503 relating to the

defense of self-protection. Among those changes is the amendment of KRS 503.055 to codify the pre-existing "no duty to retreat" rule. To this end KRS 503.055(3) was added, which states:

A person who is not engaged in an unlawful activity and who is attacked in any other place where he or she has a right to be has no duty to retreat and has the right to stand his or her ground and meet force with force, including deadly force, if he or she reasonably believes it is necessary to do so to prevent death or great bodily harm to himself or herself or another or to prevent the commission of a felony involving the use of force.

At the same time, a new provision was also added to KRS 503.050, stating: "A person does not have a duty to retreat prior to the use of deadly physical force." KRS 503.050(4).

**A. Evidence of Appellee's Opportunity to Avoid the Shooting by Retreating From Her Home was Not Admissible**

Over Appellee's objections, the Commonwealth presented evidence at trial suggesting that Appellee had an available avenue of retreat by which she could have avoided the necessity of shooting Jerald. The evidence consisted primarily of Appellee's responses during an interview with police officers investigating the shooting.[3] The Commonwealth argues now, as it did in the trial court, that these statements were evidence of Appellee's awareness of her ability to retreat, which was a relevant factor for the jury to consider in determining Appellee's state of mind, specifically

the truthfulness of her claim that she believed she was in imminent danger of death or serious physical injury at the hands of Jerald Hasch.[4]

The Commonwealth offered the "ability to retreat" evidence to prove the charge of murder by establishing that Appellee *was not* acting upon the necessity of protecting herself from Jerald, because when he attacked her (if he did so) she could have left without shooting him. In that sense, Appellee's ability to escape from his apparent attack proves nothing at all about the true nature of the threat he posed; her ability to leave the house was not relevant to the question of whether Jerald truly was a threat to Appellee when she killed him. Also, it has no probative value upon the issue of whether Appellee actually believed that Jerald was a threat. The "ability to retreat" evidence does not tend to prove that Jerald posed no real threat to Appellee, and it does not tend to refute her claim that she believed he was a threat. Its only relevance, therefore, was in showing that Appellee's *response* to her belief that Jerald was about to kill her—shooting him in self-defense—was not the only alternative available to her.

From that premise, the Commonwealth argues now, as it did at trial, that Appellee could not have truly believed that deadly force in self-defense was "necessary," as that word is used in the KRS 503.050 (Use of physical force in self-protection). Upon examination of the Commonwealth's argument, it becomes obvious that the *only* inference that the jury could rationally

---

3. For example, when asked by police, "Did you feel like, Janice, that you had to use deadly force with him or do you think you could have left?" Appellee responded, "I could have gone out the door." Appellee later added that she meant she could have left the house before the altercation escalated to the point of violence.

4. We also note that three times in his closing argument, the prosecutor mentioned that Appellee could have left the residence, implying that her use of deadly force was unnecessary, and for that reason not justifiable under the theory of self-protection.

draw from the "ability to retreat" evidence is that Appellee could not have honestly believed that her use of force against Jerald was "necessary" if she was, at the same time, aware that she could escape from him by leaving the house. That interpretation of what "necessary" means and the use of the "ability to retreat" evidence, however, undermines the fundamental purpose of KRS 503.055(3), and is simply inconsistent with the 2006 statutory changes.

The Commonwealth's argument also leads us into this "Catch 22" conundrum: because the ability to retreat would negate the necessity of using force in self-defense, the only persons under KRS 503.055 who would not have to retreat in the face of deadly force would be those who have no ability to retreat in the first place. Conversely, a victim of an attack, who was aware of an avenue of retreat, would *not* have the right to "stand his or her ground and meet force with force" because, in that event, his use of force in self-defense would not have been "necessary." That interpretation would be a significant departure from the traditional "no duty to retreat" rule, and we conclude that it is not in keeping with the legislative intent underpinning KRS 503.055(3).

KRS 503.055(3) closely mirrors the common law doctrine described by our predecessor court in *Gibson v. Commonwealth,* 237 Ky. 33, 34 S.W.2d 936, 936 (1931), quoting the words of Justice John Marshall Harlan in *Beard v. United States,* 158 U.S. 550, 564, 15 S.Ct. 962, 39 L.Ed. 1086 (1895):

The defendant was where he had the right to be, when the deceased advanced upon him in a threatening manner, and with a deadly weapon; and if the accused did not provoke the assault, and had at the time reasonable grounds to believe, and in good faith believed, that the deceased intended to take his life, or do him great bodily harm, he was not obliged to retreat, nor to consider whether he could safely retreat, but was entitled to stand his ground, and meet any attack made upon him with a deadly weapon, in such way and with such force as, under all the circumstances, he, at the moment, honestly believed, and had reasonable grounds to believe, were necessary to save his own life, or to protect himself from great bodily injury.

■■■ KRS 503.055(3) retains from its common law antecedent the element that a threatened individual may resist an attack with deadly force when he reasonably believes such force is "necessary" to prevent death or great bodily harm to himself or others. The statute's reference to the reasonable belief that force "is necessary" relates to the nature and severity of the threat posed against the individual. It does not mean that the individual facing a threat of injury or death must exhaust all other alternatives before his use of force in self-defense can be found to be "necessary." By anchoring the "no duty to retreat" rule and its corresponding right to use force upon the reasonable belief that force was "necessary" to prevent death or serious injury, the legislature was referring to the nature of the attack and whether force was needed to repel it; it did not mean to limit the right to use force only to those situations where there were no other means by which imminent physical injury or death could be avoided.

■■■■ Thus, in considering whether a defendant who was under attack reasonably believed that force was "necessary," we look at the nature of the attack he faced and consider what force, if any, was necessary to ward it off. We do not consider, as part of the "necessity" for using force, whether a victim of an actual attack could have averted the danger by evading

the attacker. And, when we consider whether the defendant was mistaken in his belief that force was necessary, we look at the accuracy of his perception that the attack was genuine, not the accuracy of his perception of ways he might escape the danger of an actual attack. Interpreted in that sense, it is obvious that an "ability to retreat" is not relevant to the determination of whether the use of force in self-defense was necessary.

The Commonwealth chooses a different interpretation, which we reject because we believe it does not comport with the legislative intent behind the 2006 statutory amendments, and because we conclude that its application would be unwieldy and confusing. We agree, however, that the Commonwealth has correctly identified the mismatching standards of the statutory justification of self-defense and the "no duty to retreat" rule. The self-protection statute, KRS 503.050(1), bases the self-defense justification on the *subjective* standard; that is, the defendant's use of force is justifiable if he *actually* believes, correctly or incorrectly, that force is necessary to protect himself from an attack from another person. In contrast, the common law "no duty to retreat" rule and its statutory successor, KRS 503.055(3), predicate a defendant's right to stand his ground and "meet force with force" without retreating from an aggressor on the *objective* standard; that is, when the defendant "reasonably believes" that such force is necessary. Thus, under the statutory language, one's actual belief that his use of defensive force was necessary will preclude a murder conviction, but he can only avail himself of the "no duty to retreat rule" if his belief was objectively reasonable.

Theoretically then, as the Commonwealth's argument goes, a defendant who *truly* holds an *unreasonable* belief that his use of defensive force is necessary for his own protection is *not* entitled to avail himself of the "no duty to retreat" doctrine. The Commonwealth harmonizes these differing statutory standards with an argument that produces this result: the availability of an avenue of escape would not be relevant in the jury's consideration of the murder charge, where refuting the defendant's *actual* (subjective) belief in the need to act in self-defense is an essential element, but it would become relevant to the lesser charge of reckless homicide, where the jury must consider whether the defendant's mistaken belief in the need to act in self-defense was a gross deviation from the reasonable person (objective) standard.

As in this case, the full panoply of homicide offenses is often part and parcel of a homicide prosecution. In such cases, the complete self-defense to which the murder charge is subject *and* imperfect self-defense that supports the lesser degrees of homicide will both be at issue. The conflict is manifest: allowing evidence of an avenue of retreat to prove the objective unreasonableness of a defendant's belief in the need to act in self-defense, but disallowing its use to disprove his subjective belief in the necessity of acting in self-defense. The ability to retreat evidence will be irrelevant, and extremely prejudicial, as to complete self-defense, but would be admissible as to imperfect self-defense. In weighing this conflict, we are persuaded that the Commonwealth's right to present ability to retreat evidence in regard to the imperfect self-defense aspect of the case must yield to the defendant's right to put on his complete self-defense case unhindered by the irrelevant and extremely prejudicial evidence.

We agree that, in the abstract, the Commonwealth's theory is metaphysically appealing; however, we are convinced that its practical application would be unwieldy

and confusing. It would require jury instructions that would, in the words of one now-retired Kentucky lawyer, "confound Aristotle," [5] and compound the current confusion that Justice Scott cites in his concurring opinion. Furthermore, the rule as proposed by the Commonwealth would function to: (1) deprive a defendant who asserts a complete self-defense theory of the very benefit the "no duty to retreat" statute was intended to provide; and (2) result in the admission of evidence in opposition to that theory whose probative value is substantially outweighed by its prejudicial effect in violation of KRE 403.

 Based upon the forgoing analysis, we determine that evidence of a defendant's awareness of a potential route of escape or retreat is not admissible for the purpose of proving that the defendant lacked a subjective belief in the necessity of using force in self-defense, or that the defendant's subjective belief in the necessity of acting in self-defense was not reasonable.

 We recognize that in many, if not most, homicide and assault cases in which the justification of self-defense is presented, a full and fair presentation of the circumstances surrounding the incident will itself suggest that the defendant had an available route of retreat or an opportunity to avoid the violent response to a confrontation by leaving the scene. We do not suggest here that the trial court should limit or suppress the presentation of such evidence and thereby distort the jury's view of the entire event. When evidence of an apparent means of retreat is so intertwined in the evidence in the case that there arises a risk that the jury will be misdirected to give it improper consideration, the court should, as the trial court did in this case, give an appropriate instruction based upon KRS 503.055(3), similar to the one recited above. We do hold that the parties in the case may not encourage the jury to draw the inference that, because an avenue of retreat was apparently available, the defendant's use of force in self-defense was not reasonably necessary, or that because a defendant was aware of an avenue of escape, he did not subjectively believe that his use of force was necessary.

## B. The "No Duty to Retreat" Jury Instruction

As a corollary to the forgoing discussion, we would be remiss if we failed to emphasize that the trial court in this case instructed the jury in accordance with the "no duty to retreat" statutes, KRS 503.055 and KRS 503.050(4). In our earlier decisions on this point, which were all based upon events that occurred prior to the effective date of KRS 503.055 and KRS 503.050(4), we consistently held that a specific jury instruction on the "no duty to retreat" rule was not necessary. *Hannah v. Commonwealth,* 306 S.W.3d 509, 515 (Ky.2010) ("[B]ecause Appellant's actions giving rise to the murder charge occurred prior to the amendments' effective date, they do not apply in his case.... [T]he trial court did not err by failing to include a 'no duty to retreat' instruction."); *Hilbert v. Commonwealth,* 162 S.W.3d 921, 926 (Ky.2005) (Kentucky follows the principle "that when the trial court adequately instructs on self-defense, it need not also give a no duty to retreat instruction.") (citation omitted).

However, in *Rodgers v. Commonwealth,* 285 S.W.3d 740, 757 n. 6 (Ky.2009), we recognized that "*Hilbert,* of course, is not applicable to conduct occurring after the July 12, 2006 effective date of [KRS

---

5. Hon. Carl R. Clontz, Mt. Vernon, Ky.

503.055 and KRS 505.050(4).]"[6] As now codified by the General Assembly in the 2006 statutory amendments, the "no duty to retreat" doctrine is squarely part of our statutory law, and is equal in dignity to the provisions of any other statute. Moreover, as we have frequently stated, "it is the duty of the court to prepare and give instructions on the whole law of the case and this rule requires instructions applicable to every state of the case deducible or supported to any extent by the testimony." *Kelly v. Commonwealth*, 267 S.W.2d 536, 539 (Ky.1954); *see also* RCr 9.54(1). "A defendant has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury on proper instructions." *Taylor v. Commonwealth*, 995 S.W.2d 355, 360 (Ky.1999).

■ Therefore, in light of the enactment of KRS 503.055 and KRS 503.050(4), we now agree that when presented with circumstances in which the provisions of those statutes are applicable, and upon the request of one of the parties, the trial court must include among the jury instructions, a "no duty to retreat" instruction, similar in form and substance to the one given in this case, which is set out above.

### C. The Admission of Evidence of Appellee's Ability to Retreat was Harmless

■ Appellee was clearly not prejudiced by the admission of her statement and the arguments of the Commonwealth based thereon. First, through her trial testimony, she had the opportunity to put into context her pre-trial statements to police, and to correct any misinterpretation of them. Second, she had the benefit of the trial court's instruction to the jury clarifying that if her belief in the necessity to use deadly force was reasonable (even if mistaken) she had no duty to retreat before exercising such force. Finally, as noted above, the evidence supporting her reckless homicide conviction was in no way dependent upon the evidence of her statements that she could have left the house prior to using deadly force.

In summary, we reiterate that, when the elements of an offense require the Commonwealth to establish that a defendant did not act under the justification of self-defense, or when a defendant raises self-defense as a justification to an otherwise criminal act, evidence that defendant may have avoided the necessity of using force by escaping or retreating from his perceived attacker shall not be admissible, except as previously noted, when it is unavoidably intertwined with other evidence. In such cases, and upon the request of a party, the trial court shall include among the jury instructions, an instruction embodying the "no duty to retreat" rule codified in KRS 503.055

### IV. ISSUES RAISED IN APPELLEE'S CROSS–APPEAL

Having determined that the Court of Appeals erred by reversing the reckless homicide conviction, we must now determine whether Appellee's cross-appeal presents valid arguments that would justify remanding the case to the Bullitt Circuit Court for a new trial on the reckless homicide charge, or whether the circuit

---

6. *Rodgers* also noted in dicta that "retreat remains a factor amidst the totality of circumstances the jury is authorized to consider" in a homicide case. 285 S.W.3d at 757. However, as we now decide, specific evidence of the defendant's ability to retreat will be heard by the jury only when it is inextricably intertwined with other relevant evidence, and in any case, it could not be considered on the issue of whether the use of force was "necessary" or whether the defendant actually believed that the use of defensive force was "necessary."

court's judgment convicting her of reckless homicide should simply be reinstated.

## A. The Combination Instruction on Reckless Homicide Did Not Deprive Appellee of a Unanimous Verdict

 Appellee asserts in her cross-appeal that her right to a unanimous jury verdict was compromised because the trial court presented to the jury both theories of reckless homicide using what we have often referred to as a "combination instruction." A combination instruction presents the jury with two or more alternate theories of criminal culpability for the same offense. A conviction based upon a combination instruction does not deprive a defendant of the right to a unanimous verdict so long as the evidence is sufficient to convict under both theories of culpability and each juror is satisfied beyond a reasonable doubt that the accused is guilty under one of the alternate theories. *Travis v. Commonwealth*, 327 S.W.3d 456, 459–60 (Ky.2010). It does not matter that individual jurors may have reached a guilty verdict by way of a different theory. *Id.*

Here, however, as noted in the preceding sections, the evidence supported only the imperfect self-defense theory of reckless homicide. It did not support the straight reckless homicide theory. We have previously determined that when either of the theories contained in a combination instruction lacks evidentiary support, there is a unanimous verdict violation if "there is a reasonable possibility that some member or members of the jury actually relied on the erroneously included theory." *Malone v. Commonwealth*, 364 S.W.3d 121, 130–31 (Ky.2012). "[I]f there is no reasonable possibility that the jury

actually relied on the erroneous theory[,] . . . then there is no unanimity problem." *Travis*, 327 S.W.3d at 463 ("Though such a case presents an error in the instructions, namely, the inclusion of surplus language, the error is simply harmless because there is no reason to think the jury was misled.").

We find here no reasonable possibility that any juror relied upon the erroneously included theory of straight reckless homicide. To convict under that theory, a juror would have had to believe that when Appellee fired the gun in the direction of her husband's face less than two feet away, she failed to perceive the risk that her conduct might result in his death. This might be possible if there was evidence that the gun discharged accidently, or that Appellee fired a weapon not knowing that another person was near enough to be in danger. But here we simply see no possibility that a juror would disregard the undisputed proof that when Appellee fired the gun, she was fully cognizant of the risk involved in such conduct, and therefore could not conceivably have done so recklessly. The conviction therefore did not violate Appellee's right to a unanimous verdict.

## B. The Trial Court's Failure to Conduct a Probable Cause Hearing under KRS 503.085 Does Not Require Reversal of the Reckless Homicide Conviction

 Prior to trial, Appellee moved under KRS 503.085(1) for the dismissal of the charges on the grounds of immunity and for an evidentiary hearing on the issue of immunity.[7] In pertinent part, KRS 503.085(1) provides:

A person who uses force as permitted in KRS 503.050, 503.055, 503.070, and 503.080 is justified in using such force

---

7. The events that took the life of Jerald Hasch and resulted in Appellee's indictment occurred in 2008, well after KRS 503.085 became effective. This case is therefore subject to the provisions of that law.

and is *immune from criminal prosecution* and civil action for the use of such force, unless the person against whom the force' was used is a peace officer, as defined in KRS 446.010, who was acting in the performance of his or her official duties and the officer identified himself or herself in accordance with any applicable law, or the person using force knew or reasonably should have known that the person was a peace officer.

The trial court denied both requests. Appellee now argues that our opinion in *Rodgers,*[8] requires that upon proper request, the trial court must make a pre-trial determination of whether the defendant acted in self-defense, and if so, dismiss the charge under the statutorily granted immunity. The Commonwealth concedes that the trial court's failure to hear the evidence and make that determination was error, and we agree. We also note, however, that the trial took place more than four months *before* our opinion in *Rodgers* was rendered. We expressly noted in *Rodgers* that "[t]he trial judge's uncertainty regarding how to implement the immunity provision [of KRS 503.085] is understandable because the statute offers little guidance." 285 S.W.3d at 754. Thus, we can hardly fault the trial court here for its handling of the same issue, which was at that time a relatively new and untried development in criminal law in Kentucky.

More importantly, it is abundantly clear that had the trial court followed the procedure detailed in *Rodgers* at the time Appellee filed her motion, there was more than enough evidence establishing probable cause to believe that she had not acted with justification. The only direct evidence of justification was Appellee's explanation for shooting her husband, which the court was not compelled to believe. Further, the circumstantial evidence available at that time provided probable cause to believe that Appellee was either mistaken or dishonest in her claim that she had to act for her own protection. Accordingly, we conclude that the failure to make a pretrial determination of whether Appellee was immune from prosecution was harmless error for which she is entitled to no relief.

## C. The Jury was Properly Instructed upon its Penalty Phase Options

Appellee next contends that the trial court erred by failing to instruct the jury that it could, in lieu of imprisonment, fix her punishment at a fine of not less than $1,000.00 and not greater than $10,000.00.[9] We addressed the same issue in *Simpson v. Commonwealth,* 889 S.W.2d 781, 783–84 (Ky.1994). There, we held that it was error to instruct the jury in a felony case that it could impose both imprisonment and a monetary fine if it found the defendant guilty. *Id.* We held that upon a felony conviction, the assessment of a fine was a matter "the judge must independently determine." *Id.* at 784. We find no fallacy in our resolution of the issue in *Simpson,* and see no reason to reconsider it now.

---

8. The standard called for in *Rodgers* is whether there exists probable cause to believe that the defendant's use of force was not justified on grounds of self-defense as defined by the applicable statutes. 285 S.W.3d at 754–55.

9. KRS 532.030(3) provides: "When a person is convicted of an offense other than a capital offense or Class A felony, he shall have his punishment fixed at: (a) A term of imprisonment authorized by this chapter; or (b) A fine authorized by KRS Chapter 534; or (c) Both imprisonment and a fine unless precluded by the provisions of KRS Chapter 534." Reckless homicide is a Class D felony. KRS 507.050(2). KRS 534.030(1) sets the amount of a fine at not less than $1,000.00 nor more than $10,000.00.

■ The penalty phase instructions properly instructed the jury to fix Appellee's punishment at imprisonment for not less than one year nor more than five years. The imposition of a fine is the responsibility of the trial court, not the jury.

### D. Admission of the Autopsy Report

■ Appellee contends that the trial court erred to her prejudice by allowing into evidence at trial the autopsy report prepared by Dr. Amy Beckham, the medical examiner who conducted the victim's autopsy. Appellee argues that the written report unfairly bolstered Beckham's live testimony, and to the extent it was consistent with her live testimony, the report was hearsay.

Further, to the extent that the report is inconsistent with the witness's live testimony, Appellee alleges a discovery rule violation. That claim is based upon the notation in the report, which was provided to Appellee in advance of trial, that the fatal bullet was fired from an "indeterminate range." From the witness stand, Beckham testified that the victim was shot from a distance of between two inches and twenty-four inches. Thus, Appellee claims she was misled by the report.

Finally, Appellee claims that the autopsy report incorporated findings of a toxicology analysis that was not prepared by Beckham, and its admission as part of the autopsy report allowed it into evidence without a proper foundation. Dr. Beckham testified that she had reviewed the toxicology results as part of her duties.

■ We find no reversible error in the admission of the autopsy report. First, Appellee's only objection to the trial court was upon the grounds that the report improperly bolstered the witness's live testimony and thereby unduly emphasized its importance. Thus, her complaints of a discovery violation (in the range of the shooting) and the lack of an evidentiary foundation (for the toxicology report) were not preserved. *Kennedy v. Commonwealth*, 544 S.W.2d 219, 222 (Ky.1976), *overruled on other grounds by Wilburn v. Commonwealth*, 312 S.W.3d 321 (Ky.2010). Appellee does not request palpable error review, and we decline to do so *sua sponte.*

Nevertheless, we note that Dr. Beckham testified that "indeterminate range" means a distance of between two inches and twenty-four inches, so there was no inconsistency. Finally, we conclude that even if the autopsy report unduly bolstered the witness's testimony and the toxicology information was erroneously included, there is simply no substantial possibility in this case that either issue swayed the verdict to Appellee's detriment. *See Winstead v. Commonwealth*, 283 S.W.3d 678, 688–89 (Ky.2009). Even if admitting the report was error, there is no doubt that it was harmless.

### E. Exclusion of Neighbor who Saw Appellee's Wound from Prior Assault

■ Appellee attempted to introduce testimony from her neighbor, Robert Williams, to the effect that several months before the shooting he saw Appellee with a "busted lip." When the Commonwealth objected, Appellee informed the trial court that this evidence would become relevant when she later testified to being a frequent victim of domestic violence at the hands of her husband. Williams could not testify that he had witnessed any acts of domestic violence between Appellee and Jerald, and he could not testify that the lip injury resulted from domestic violence. Therefore, the trial court held that the existence of the lip injury alone was not relevant until competent evidence was presented that Jerald had physically abused Appellee. Until Appellee put on such evidence,

the fact that at one time she had a "busted lip" was immaterial.

Significantly, later in the trial Appellee did testify that her husband had frequently abused her, including the occasion in which she suffered the lip wound. Having thus established the relevance of her previous wounds, Appellee failed to avail herself of the opportunity to call Williams to corroborate the existence of her lip injury and her claim that she was a victim of domestic violence. We find no error in the trial court's decision to exclude Williams's testimony at the time it was offered. Appellee's failure to offer it at a later time is therefore not an error of the trial court for which appellate relief is available.

**F. Exclusion of testimony about police training on weapon retention**

 Appellee also sought to introduce the testimony of a retired state trooper, Nellis Willhite. Willhite would have testified that state police officers are trained on the importance of retaining possession of their weapons when involved in a scuffle with someone who was trying to take the weapon. The trial court failed to see the relevance of that information, and neither do we.

Willhite's proffered testimony was preserved by an avowal. He would have told the jury that police officers are trained to retain their weapon "at all costs" and "to use whatever force, including deadly physical force, to prevent someone from taking your weapon." He added that police officers are taught to "never surrender their weapon." Appellee contends that Willhite's lesson in weapons retention would have helped the jury understand what a reasonable person would do if someone was trying take that person's gun.[10] She

also claims that Willhite's testimony would have helped the jury see that her use of deadly force against Jerald was a reasonable effort on her part to retain possession of the pistol.

We reject Appellee's argument out of hand. While we offer no comment on what force a police officer may or may not exert in order to retain his weapon, it is clear that no part of Kentucky law authorized Appellee to use deadly force for the sole purpose of retaining possession of the gun. The proffered testimony would have misinformed the jury and the trial court properly excluded it.

## V. CONCLUSION

For the reasons set forth herein, we hereby reverse the opinion of the Court of Appeals and reinstate the judgment of the Bullitt Circuit Court convicting Appellee/Cross–Appellant, Janice Hasch of the crime of reckless homicide and imposing a sentence of imprisonment for two years.

All sitting. All concur. SCOTT, J., also concurs by separate opinion in which CUNNINGHAM and NOBLE, JJ., join.

SCOTT, J., concurring:

Given the multitude of precedents written by this and previous Kentucky Supreme Courts, I must concur in Justice Venters' opinion. In concurring, however, I must state my belief that the jury's verdict in this case is another sad testimonial to the confusion generated by our self-defense statutes and instructions.

For this reason, I feel compelled to restate what I first said in 2005, to wit:

> I believe [Janice Hasch's] conviction is a sad testimonial to the **confusing** state

---

**10.** The irony is that the weapon here belonged not to Appellee but to Jerald Hasch. Willhite did not discuss what force Jerald was authorized to use to regain possession of *his* weapon.

of our self-defense statutes and instructions.

Because no one wants to be the one to say it, we have come to a point in our criminal jurisprudence where people innocent of murder are being convicted, yet guilty persons are getting lesser sentences. Simply because our homicide laws have become so complicated—their instructions so convoluted—that our juries of today, as intelligent as they are, cannot understand the sequence [, concepts,] and language of the instructions-nor can we at times.

Were the statutes upon which the instructions are based not so particularized[,] they should be held void for vagueness. The sad commentary however is that we should not have tinkered with our self-defense laws in the first place.

"[T]he Kentucky law of self-defense took shape in the early days of common law and changed very little thereafter. Under this law, a defendant charged with homicide was entitled to exoneration upon a showing that (1) he believed that the conduct of the victim posed an imminent threat of death or of serious bodily injury to him [or others]; (2) he believed that the use of deadly physical force was necessary to avert that threat; and (3) *he had reasonable grounds* to entertain the beliefs that compelled him to act." William S. Cooper & Robert G. Lawson, *Self–Defense in Kentucky A Need for Clarification or Revision,* 76 Ky. L.J. 167, 170 (1987). [ (Emphasis added.) ]

Yet we made major changes to our self-defense laws with the adoption of the new Penal Code in 1974. Now we have not only self-defense—but also imperfect self-defense, along with a multitude of other defense rules and sub-rules; all of which, when mixed together

in instructions with lesser included offenses of various relevant mental states, becomes incomprehensible to even the most educated. *See* KRS 503.050 through 503.120. With the inadequate training and time our juries have to deal with these instructions—[it's] akin to expecting someone unfamiliar with computers to operate one at an expert level in one day. It is simply not working and our juries are guessing at the proper results, or more often, convicting of a lesser included offense, sometimes rightly—sometimes wrongfully—simply as a **compromise** to **confusion.**

"What is to be done? The status quo is obviously undesirable. Perhaps the Kentucky General Assembly should address the problem with new legislation. The cases suggest that the existing statutes may be too complicated to be functional and that legislative intervention is unavoidable. Assuming this to be true, there are at least four options deserving of consideration by the General Assembly. The *first* option is to restore the law to its existence prior to the adoption of the new Code." William S. Cooper & Robert G. Lawson, *Self–Defense in Kentucky A Need for Clarification or Revision,* 76 Ky. L.J. 167, 194 (1987). I believe it must be restored.

The very first Section of our Constitutional Bill of Rights provides: "All men are, by nature, free and equal, and have certain inherent and inalienable rights, among which may be reckoned: *First:* The right of enjoying and defending their lives and liberties."

The closing section of the Bill of Rights (Section 26) provides: "General powers subordinate to Bill of Rights-Laws contrary hereto are void. To guard against transgression of the high powers which we have delegated, We Declare that every thing in this Bill of

Rights is excepted out of the general powers of government, and shall forever remain inviolate; and all laws contrary thereto, or contrary to this Constitution, shall be void." The first part of Section 1 of our Bill of Rights first appeared in our current Constitution adopted in 1891. It was not set out in such a manner in the three previous Constitutions of 1792, 1799 and 1850. Thus, it was an express affirmation of the time that these rights were that important and would remain inviolate and no power was (or would be) granted under our Constitution to change them.

A careful perusal of the official report of the proceedings and debates in the convention held in Frankfort in September of 1890, discloses the distrust many of the delegates had for the "High Courts" and how they had construed (or misconstrued) language in previous Constitutions. It is reported the Honorable delegate from Pen[ ]dleton County, Mr. Leslie T. Applegate, argued to those assembled:

> yet some of these principles are vital to the issues of the day. We have labored somewhat upon them and have altered them some. Why? Because the experience of time has shown that along in 1849 or in 1850, and even going back to 1792, they didn't mean what the men who used them thought they meant; and while I have the profoundest respect for our courts, yet they have turned their forces upon it, and they have turned the light of reason upon it, and we have found that these expressions are deficient to protect men and their private rights, and for that reason we have enlarged upon the expressions here. . . . If you can ever use language so plain and specific that the courts will not sometime or another make a change in it, then I would like you to

employ it, because this morning I [sat] down in the library and took down Barbour's digest and found that that court has overruled itself more than 100 times in its history; then if they themselves cannot say what they mean and stick to it, how in the name of heaven can we use any language that will be always construed as we wish it and which they will stick to

*Debates Constitutional Convention,* 1890, Ky. Vol. I, Pg. 590–591.

The Honorable delegate from Todd County, Mr. H.G. Petrie, pointed out to those assembled:

> [i]n thinking about it, it occurred to me that these judges who are giving this satisfactory interpretation of that clause of the Constitution will in a few years pass away from the honored seats they now occupy, and those seats will be filled by other judges. It will be, as it was said by the delegate from Pen[ ]dleton, the same court but different judges. Who knows how they may view that section? They may conclude that the interpretation of the present judges is wrong. They may be unable to concur. They may say that the construction given that clause by some of the other judges way back yonder was the correct one; and then we would have the trouble again; so it seems to me if human language can be so arranged as to express really the thought intended to be conveyed by that . . . section, that it ought to be done.

*Ibid* 625.

The Honorable Robert Rodes, the delegate from Warren County, echoed these arguments to those assembled:

> I beg leave to call your attention to the fact that there have been judges in the history of the world who have

laid stress upon particular words and did not hesitate to construe words or misconstrue them as they deem proper. . . .

*Ibid* 776.

In his arguments at the convention, the able delegate from Warren County, Robert Rodes, [also] set out for those assembled and posterity, the structure and purpose of the very last Bill of Rights, Section 26:

let us now come and look at the last section. "To guard against transgression of the high powers which we have delegated, We Declare that everything in this Bill of Rights is excepted out of the general powers of government, and shall forever remain inviolate; and all laws contrary thereto, or contrary to this Constitution, shall be void." That is to say, it is consecrated. This is no ordinary part of the Constitution, and if by any misfortune or inadvertence any other part of it comes into conflict with the Bill of Rights, I apprehend there is not a court in the land that would not say that the Bill of Rights is paramount. It is sacred; they are set apart in a room or apartment by themselves and the mandate is, let no profane hand or foot come near it.

*Ibid* 443.

It is a certainty then that the framers of our current Constitution intended the people to retain their rights of defending-their lives and liberties based upon the standards that had been formulated for the preceding 182 years and that they tried—as best they could—to use words and structure that would withstand the ages, minds and eyes of time. These standards can be found in the decisions of the time and define the guidelines, in simple understandable terms, for a citizens' right to self-de-

fense and they are as binding upon this court as they are on the legislature.

"In dealing with the scope and breadth of the authority of the legislature . . ., the courts without exception not only hold that a law-making body may not transgress the inhibitions contained in the Bill of Rights as incorporated in Constitutions, but also hold that when it is attempted, it is within the power of courts to so declare and hold enactments in violation of the Bill of Rights illegal and therefore void." *City of Louisville v. Kahn* [*Kuhn* ], 284 Ky. 684, 145 S.W.2d 851, 853 (Ky.1940).

Therefore, since the Constitution specifically gave the government no power to change the right of self-defense, our current statutes are unconstitutional—being outside the powers granted. I would further note that one who truly acts in self-defense, and is thereby acquitted of murder, could not be guilty of a lesser crime involving a wanton or reckless state of mind for the same act—as we now do. As a trial judge, I believed this and still do.

Society builds its prisons to hold people that are just [downright] mean; those who rob, cheat, steal and hurt people. Prisons are not built to incarcerate citizens who do what they are compelled to do by the love of life itself—risk their lives to defend their families and close ones. Such people are not a statistical threat to society—only to those who would do them harm. And according to our Constitution, framed in 1891, that's not criminal conduct.

Though I submit some will see the truth in what I write today—many will recoil from the havoc its recognition might create [among the multitude of convictions since this change to the penal code in 1974]. We've come so far down this illogical road—[it's] just too

hard for many to go back—even when the Constitution—in the plain English of 1891, when it was written in—commands it.

Hopefully however, the Legislature will see this as a "wake-up call" and put us back where we should be [in future trials]. . . .

*Brown v. Com.*, 2002–SC–0739–MR, 2005 WL 923699 (Ky. Apr. 21, 2005) (Scott, J., dissenting).

I still believe this and I believe this conviction supports my belief as to the overwhelming confusion created by our self-defense statutes and instructions among our jurors today. Thus, I reluctantly concur.

` CUNNINGHAM and NOBLE, JJ., join.