RENDERED: DECEMBER 17, 2015
TO BE PUBLISHED

# Supreme Court of Kentucky

FINAL

2014-SC-000267-MR

DATE 1-7-16 Ewa Grount, D. C.

PATRICK DEON RAGLAND      APPELLANT

V.

ON APPEAL FROM FAYETTE CIRCUIT COURT
HONORABLE ERNESTO SCORSONE, JUDGE
NO. 11-CR-01338

COMMONWEALTH OF KENTUCKY      APPELLEE

## OPINION OF THE COURT BY JUSTICE NOBLE

### REVERSING AND REMANDING

The Appellant, Patrick Deon Ragland, was convicted of second-degree manslaughter for the beating death of Kerry Mitchell. He was also convicted of tampering with physical evidence and of being a first-degree persistent felony offender. He was sentenced to twenty years' imprisonment and now appeals as a matter of right, raising numerous claims of error, including that the trial court erred by adding a "no duty to retreat" jury instruction to a general self-protection instruction and by inadequately instructing the jury on the justifiable use of force to protect against unwanted sexual intercourse compelled by force or threat. Because the Court concludes that such instructional errors were prejudicial, Ragland's convictions are reversed, and this case is remanded for a new trial.

# I. Background

On December 28, 2010, Kerry Mitchell was found dead in a closet in his unlocked apartment. His body was bruised and bloody, and decomposing. A strap from a gym bag was wrapped around his neck, and a bloody footprint was visible on the back of his shirt. The medical examiner attributed Mitchell's death to two causes: loss of blood and lack of sufficient oxygen to vital organs caused by compression to the neck. The medical examiner testified that, given the state of decomposition, it had not been possible to reliably judge the amount of blood loss to definitively settle on one or the other cause. Toxicology results showed evidence of alcohol, methamphetamine, methadone, cocaine, and oxycodone in Mitchell's system. Under his fingernails, investigators found DNA from Patrick Ragland, who ultimately admitted to beating Mitchell six days before his body was found.

Ragland was homeless in 2010. From time to time he visited the Hope Center in Lexington, from which he received food and overnight shelter when needed. It was through the Hope Center that Ragland met Mitchell, who was attending court-ordered substance-abuse classes at the center. They developed a friendship centered primarily around drug use. Mitchell was openly homosexual. Ragland denied having any sexual relationship or engaging in any sort of sexual acts with Mitchell.

When Ragland first spoke with police on December 29, he denied any involvement in Mitchell's death and told police that he had last seen Mitchell on December 21. Police could see that he had no notable injuries (Ragland later confirmed that his only injury had been to his foot). He finally admitted to

beating Mitchell, and claimed self-protection, in September 2011 when the police confronted him with DNA evidence implicating him.

According to Ragland, on December 22, he went to Mitchell's apartment at around 4:00 p.m. to get some sleep after having been up the previous three nights getting high with Mitchell. When Ragland arrived, Mitchell reportedly propositioned Ragland for sex in exchange for allowing him to nap at his apartment. Ragland testified that he thought Mitchell was joking, explaining that he had frequently joked like that.

When Ragland laid down on the floor in Mitchell's living room, Mitchell reportedly laid down next to him. Ragland testified that Mitchell told him to leave when he told Mitchell to stop. Ragland asked to stay, saying that it was cold outside and that he had nowhere else to go, to which Mitchell reportedly responded, "If you ain't going to give me some, you can get the fuck out of here." Then, Mitchell apparently told Ragland that he was just playing with him.

Ragland claimed that he had dozed off for about thirty minutes when he woke to find his penis in Mitchell's hand as he apparently tried to give Ragland oral sex. Ragland pushed Mitchell off of him and punched him in the face. He also managed to grab a skillet, and he hit Mitchell with it. (At trial, he claimed that Mitchell hit him with the skillet first before he wrestled it away from him.) According to Ragland, although he knocked Mitchell to the floor with the skillet and caused him to bleed, Mitchell would not be subdued and kept coming at him.

Eventually, Ragland tried to get to Mitchell's bedroom to retrieve his gym bag containing everything he owned, which was apparently in Mitchell's closet. But Mitchell reportedly grabbed his legs, so Ragland had to "forcefully drag" him to try to get to the bedroom closet. Ragland testified that Mitchell let go of his legs once he got to the bedroom, but then came at him again in the closet, and the fight resumed. While Ragland recalled hitting Mitchell in the closet with the skillet "at least two more times," blood-spatter evidence revealed six distinct impacts had occurred in the closet. Ragland did not recall strangling Mitchell with the strap from his gym bag that police later found wrapped around his neck.

According to Ragland, Mitchell was alive and asking for help when he left the apartment. Ragland testified that he did not think Mitchell would die. He admitted to taking Mitchell's cell phone when he left, claiming that he did so because he was scared Mitchell would call the police on him for their fight. He also disposed of his bloody clothing after leaving the apartment. He testified at trial that he did so because he knew Mitchell was HIV positive and was scared of contracting the disease. He claimed he did not initially tell police what had happened because he was scared they would not believe him and was embarrassed about being sexually assaulted.

Ragland was charged with murdering Mitchell, and he claimed self-defense. The jury convicted him of second-degree manslaughter, as well as tampering with evidence and of being a first-degree persistent felony offender. The jury recommended concurrent sentences of ten years and five years for the manslaughter and tampering convictions, each enhanced to twenty years for

4

the PFO conviction. The trial court sentenced Ragland to a total of twenty years in prison in accordance with the jury's recommendations.

He now appeals as a matter of right. *See* Ky. Const. § 110(2)(b).

Additional facts will be developed as needed in the discussion below.

## II. Analysis

### A. The trial court's self-protection and no-duty-to-retreat jury instructions were reversible error.

Ragland first claims that the trial court improperly instructed the jury on self-protection. To analyze his claim, it is instructive to begin by comparing the instruction Ragland requested with that given by the trial court.

Ragland asked the trial court to instruct the jury as follows:

### INSTRUCTION NO. 3
### PROTECTION OF SELF

If at the time the Defendant, Patrick Ragland, used physical force upon Kerry Mitchell, he believed that such force was necessary to protect himself against death, serious physical injury, kidnapping, sexual intercourse compelled by force or threat, or a felony involving the use of force, then he was privileged to use such physical force against Kerry Mitchell as he believed to be necessary in order to protect himself, including the right to use deadly physical force.

The trial court declined to give Ragland's requested instruction, instead choosing to mostly (but not perfectly) parrot the form instruction for self-protection provided by Justice Cooper and Mr. Cetrulo. *See* 1 William S. Cooper & Donald P. Cetrulo, *Kentucky Instructions to Juries (Criminal)* § 11.07 (Rev. 5th ed. 2007). Accordingly, the judge gave the following two-part jury instruction:

5

## INSTRUCTION NO. 3
## PROTECTION OF SELF

A. If at the time an individual, including the Defendant, uses physical force upon another person he believes that person was then and there about to use physical force upon him, he is privileged to use such physical force against that person as he believes to be necessary in order to protect himself against it, including the right to use deadly physical force but only if he believes deadly physical force to be necessary to protect himself from death or serious physical injury.

B. A person who is not engaged in an unlawful activity and who is attacked in a place where he has a right to be has no duty to retreat and has the right to stand his ground and meet force with force, including deadly force if he or she reasonably believes it is necessary to do to prevent death or great bodily harm to himself or to prevent sexual intercourse compelled by force or threat.

Ragland raises several complaints about the instruction given, but at its core, his claim is that the trial court denied him his right to put on a defense because its instruction mixed language from KRS 503.055 (the "stand your ground" statute) and KRS 503.050 (the general self-protection statute).

His primary complaint with the instruction seems to be two-fold. First, he complains that Part A (the general self-protection language) did not include language from the statute providing that he was privileged to use force "to prevent sexual intercourse compelled by threat or force," KRS 503.050(2); and as a result, according to Ragland, the judge improperly required the jury to find that he must have been faced with violent, physical force that was likely to cause death or serious physical injury, rather than other forces or threats permitted under the statute. Second, he complains about the court "adding" four qualifying conditions in Part B (the no-duty-to-retreat language), which are not required to find a justifiable use of force in self-defense under KRS 503.050. Specifically, he takes issue with including "additional

6

qualifications" copied straight from the no-duty-to-retreat provision in KRE 503.055(3)[1] because they introduced several factors and conditions that did not apply under the facts of this case and, instead, served only to confuse the jury and prevent them from properly considering his defense. And bringing together the two aspects of his claim, he contends that the jury's inability to fairly consider his defense as a result of the alleged muddling of these instructions was further compounded by the trial court's inclusion of the protection-from-compelled-sexual-intercourse language only with Part B's convoluted and inapplicable no-duty-to-retreat language and not with Part A's general self-protection language.

The Commonwealth counters by arguing that the trial court's instruction cannot have been erroneous because its no-duty-to-retreat language in Part B was almost identical to the language this Court expressly approved in *Commonwealth v. Hasch*, 421 S.W.3d 349, 355, 363–64 (Ky. 2013).[2]

The problem with both the trial court's and the Commonwealth's mechanical approach to giving the no-duty-to-retreat instruction here is that it

---

[1] KRS 503.055(3) provides:

A person who is not engaged in an unlawful activity and who is attacked in any other place where he or she has a right to be has no duty to retreat and has the right to stand his or her ground and meet force with force, including deadly force, if he or she reasonably believes it is necessary to do so to prevent death or great bodily harm to himself or herself or another or to prevent the commission of a felony involving the use of force.

[2] The Commonwealth did not otherwise address the specific grounds raised by Ragland in attacking the no-duty-to-retreat instruction given. Nor did the Commonwealth specifically address Ragland's related argument that the trial court also erred in failing to include the "to protect against sexual intercourse compelled by threat or force" language in Part A.

7

ignores that, as Ragland correctly points out, KRS 503.055(3) and its various qualifications were not implicated by the circumstances underlying the self-defense claim raised in this case. None of the circumstances surrounding the incident at Mitchell's apartment suggested that Ragland had an available route for retreat, or other opportunity to altogether avoid the confrontation and his violent response, that could have otherwise created "a risk that the jury w[ould] be misdirected to give it improper consideration." *Id.* at 363. As this Court explained in *Hasch,* it is only in such situations "where evidence of an apparent means of retreat is so intertwined in the evidence in the case" that the trial court should give an appropriate no-duty-to-retreat instruction based on KRS 503.055(3). *Id.* This is because so doing prevents the jury from improperly considering the available means of retreat, or the defendant's knowledge of the available means, as evidence that the use of force was not reasonably necessary or that the defendant did not subjectively believe that the use force was necessary. *Id.* But when there is no such risk, because the jury is not presented with any such evidence to improperly consider, there is no need to give the instruction.

Thus, the trial court and Commonwealth are mistaken in their apparent shared belief that, since *Hasch,* such instructions are required to be given in all self-defense cases. Indeed, the Court in *Hasch* held only that trial courts must give a no-duty-to-retreat jury instruction "when presented with circumstances in which the provisions of [KRS 503.055(3) and KRS 503.050(4)[3]] *are*

---

[3] KRS 503.050(4) provides that "[a] person does not have a duty to retreat prior to the use of deadly physical force."

8

*applicable*, and upon the request of one of the parties." *Id.* at 364 (emphasis added). Since the no-duty-to-retreat provisions did not apply to the circumstances in this case and were not material to Ragland's defense, it is clear that the trial court included the Part B no-duty-to-retreat language unnecessarily.[4] It was error to over-instruct the jury as such. And because Ragland had a "right to have every issue of fact raised by the evidence and material to his defense submitted to the jury on proper instructions," *Taylor v. Commonwealth*, 995 S.W.2d 355, 360 (Ky. 1999), it was also error to fail to include in the general self-protection instruction the requested language from KRS 503.050(2) permitting the use of force "to protect against sexual intercourse compelled by threat or force."

However, whether these errors require reversal is a different question. And the case law presents somewhat conflicting standards for analyzing the harmlessness of such errors. On the one hand, this Court long held that instructional errors such as these will require reversal only if the instructions given are thus "susceptible of a misleading and prejudicial interpretation by the jury, and thereby conducive to an unjust verdict." *Maddox v. Commonwealth*, 349 S.W.2d 686, 692 (Ky. 1960); *see also Abbott v. Commonwealth*, 205 S.W.2d 348, 350 (Ky. 1947) ("While it may be admitted that the giving of these unnecessary, surplus instructions ... was in the nature of error, yet it must be

---

[4] We also note in passing that it appears that the no-duty-to-retreat language was given not upon the request of either of the parties, but instead upon the court's own insistence that it be included.

9

remembered that where it appears that an error such as this did not mislead the jury nor produce an unjust verdict, the judgment will not be reversed.").

On the other hand, while it does not appear that the standard propounded in these and similar cases was ever expressly abrogated, this Court has more recently adopted a "more rigorous ... approach to harmless error in jury instructions." *Harp v. Commonwealth*, 266 S.W.3d 813, 818 n.6 (Ky. 2008). Under this approach, "[e]rroneous instructions are 'presumed to be prejudicial' and the Commonwealth 'bears the burden of showing affirmatively that no prejudice resulted from the error.'" *Wright v. Commonwealth*, 391 S.W.3d 743, 749 (Ky. 2012), *as modified on denial of reh'g* (Feb. 21, 2013) (quoting *Harp*, 266 S.W.3d at 818). The Commonwealth may rebut this presumption by demonstrating that the instructional error had no effect on the verdict or judgment. *Id.*

Apparently taking for granted the correctness of its overly mechanistic reading of *Hasch* as discussed above (while wholly declining to address the trial judge's failure to instruct on protection against compelled sexual intercourse in the general self-protection instruction), the Commonwealth failed to advance any harmlessness argument regarding the instructional errors here. Under this Court's current approach to harmless-instructional-error analysis, the Commonwealth's failure to make the requisite affirmative showing to overcome the presumption of prejudice resulting from the errors in the jury instructions would seem to be the end of our inquiry.

But that notwithstanding, even if we applied the older standards, this Court is still convinced that the erroneous instruction requires reversal. By

including the superfluous no-duty-to-retreat language, where the evidence did not support doing so, the court unnecessarily convoluted the jury's consideration of Ragland's self-defense claim, adding additional facts and conditions that the jury reasonably would have perceived as necessary to find before it could accept his self-protection defense. That needless convolution of the instruction, plus the failure to instruct the jury in the general self-protection portion of the instruction that Ragland was privileged to use force to protect himself against sexual intercourse compelled by force or threat, were unavoidably susceptible to misleading or prejudicial interpretation by the jury and thus conducive to an unjust verdict.

In sum, the erroneous jury instruction created a significant risk of misleading the jury and preventing it from fairly considering every issue of fact and law raised by the evidence. Because the instructional errors were not harmless, this Court must reverse Ragland's conviction and sentence. Because we are reversing on this ground, we will address Ragland's other claims of error only to the extent they are likely to recur on retrial or would bar his retrial.

## B. Ragland was not entitled to immunity from prosecution under KRS 503.085.

Ragland claims that he was entitled to immunity from prosecution under KRS 503.085 and that the trial court erred in overruling his motions to dismiss brought under that statute.

Before trial, the judge held a hearing on Ragland's motion to dismiss under KRS 503.085, at which the lead detective in the case, Sergeant David Richardson, testified about his investigation, and crime scene photographs

11

were entered into the record. After the hearing, the trial court overruled Ragland's immunity claim, finding that the Commonwealth had sufficiently established probable cause that Ragland's use of force was unlawful. Ragland then filed a petition for a writ with the Court of Appeals seeking relief from the trial court's rejection of his immunity claim, and simultaneously asked the circuit court to stay his trial while he pursued the writ action. The trial court denied Ragland's motion to stay his trial, and the Court of Appeals denied his writ petition shortly thereafter, holding that he had an adequate remedy by appeal. He did not appeal the Court of Appeals' denial of his request for a writ to this Court, and that decision is not at issue in this direct appeal. The trial court also denied Ragland's renewed motion for immunity at trial.

When a claim of immunity is raised under KRS 503.085, the prosecution may nonetheless proceed if the trial court believes "there is probable cause to conclude that the force used was not legally justified" under the controlling provisions of KRS Chapter 503. *Rodgers v. Commonwealth*, 285 S.W.3d 740, 754 (Ky. 2009). When the defendant "has been tried and convicted by a properly instructed jury in a trial with no reversible error," this Court has held that questions raising the propriety of the trial court's immunity determination become "purely academic." *Id.* Under such circumstances, the defendant's "self-defense claim has been thoroughly examined by both the trial judge under the directed-verdict standard and the jury under the court's instructions and his entitlement to self-defense has been rejected." *Id.* In such cases, when a jury has already convicted the defendant—and, thus, found that his use of physical force in fact was unlawful beyond a reasonable doubt—and that

12

conviction has not been shown to be flawed, the appellate court will not revisit whether there was probable cause to believe that a defendant's use of force was unlawful to allow prosecution under KRS 503.085.[5] But because Ragland has indeed shown his conviction to be flawed due to the instructional errors discussed above, it is necessary to address the merits of his immunity claim, which would preclude the prosecution from going forward on remand were this Court to find error in the trial court's denial of immunity.

The standard of review of a denial of a defendant's motion to dismiss for immunity from prosecution under KRS 503.085 is whether the trial court had a "substantial basis" for finding probable cause to conclude that the defendant's use of force was unlawful. *Commonwealth v. Lemons*, 437 S.W.3d 708, 715 (Ky. 2014). The standard of probable cause is "a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). It has been defined as "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *Commonwealth v. Jones*, 217 S.W.3d 190, 200 (Ky. 2006) (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)) (internal quotation marks omitted). And judges must consider the totality of the circumstances then

---

[5] Although the question is not before the Court in this case, the appropriate avenue for a criminal defendant to seek judicial review of an unfavorable immunity ruling is likely exactly what Ragland did in this case: file an original writ petition in the Court of Appeals. *Cf. Commonwealth v. Farmer*, 423 S.W.3d 690, 698 n.4 (Ky. 2014). Of course, the Court of Appeals denied the petition on the ground that he had an adequate remedy by appeal or otherwise. Ragland, however, declined to appeal that decision, which would have been as a matter of right. *See* CR 76.36(7)(a); *see also, e.g., Russell Cty., Ky. Hosp. Dist. Health Facilities Corp. v. Ephraim McDowell Health, Inc.*, 152 S.W.3d 230, 234 (Ky. 2004).

13

known to determine whether probable cause exists to conclude that a defendant's use of force was unlawful. *Rodgers*, 285 S.W.3d at 754–55.

Based on the evidence of record put forth by the Commonwealth at the probable cause hearing, we have little trouble concluding that the trial court had a substantial basis for denying Ragland's motion to dismiss. Sergeant Richardson testified that Mitchell's body was found in his bedroom closet in his apartment, where he had been badly beaten and strangled. A bloodied frying pan, which had both Mitchell's and Ragland's DNA on it, was also found in the closet. And the walls of the closet had been covered in the victim's blood, demonstrating that Ragland struck Mitchell with the frying pan several times in the closet.

Further, a strap was found wrapped around Mitchell's neck, and a boot or shoe print was discovered on his back, appearing as if Ragland had also strangled Mitchell by bracing his foot against the man's back and pulling the strap around his neck. Ragland's DNA was found under Mitchell's fingernails. The investigation uncovered that Mitchell and Ragland had met at the Hope Center, and a witness identified Ragland in a photo lineup as the man whom Mitchell had described as his boyfriend. During interviews with police, Ragland initially denied any involvement in Mitchell's death, but when confronted with the DNA evidence months later, he admitted to fighting him and hitting him with the frying pan, claiming to have done so after Mitchell touched his genitals when he was sleeping. He did not indicate to police that Mitchell had otherwise physically attacked him or had a weapon. Mitchell had stood about 5 feet, 5 inches tall and weighed approximately 148 pounds, while Ragland was about

14

six feet tall and weighed around 160 pounds. The altercation did not occur in a single room, but appeared to have been pursued room-to-room through the apartment. Ragland also admitted to taking Mitchell's cell phone when he fled the apartment and to disposing of his own bloody clothes and shoes shortly thereafter.

After considering this evidence, the trial court listed the following as its bases for finding probable cause that Ragland's use of force was unlawful and unjustified: first, that Ragland never reported being attacked by Mitchell or fearing for his life; second, that it appeared Ragland had moved Mitchell's body into the closet, after first striking him with the frying pan in the living room, and that extensive blood spatter indicated that he continued to strike Mitchell repeatedly once in the closet; third, that his disposal of his bloody clothes and footwear in attempting to hide his involvement in Mitchell's death was inconsistent with acting in self-defense; and fourth, and most determinative, that the evidence indicating that Mitchell had been strangled in addition to being badly beaten was not self-defense-type behavior.

The foregoing clearly constitutes a substantial basis for finding probable cause and denying Ragland's motion to dismiss. Therefore, the trial court did not err in determining that Ragland was not entitled to immunity under KRS 503.085.

## C. Admission of crime-scene and autopsy photographs was not error.

Ragland also claims that eight photographs showing Mitchell's corpse at the crime scene and during the autopsy had little probative worth and were

15

unduly prejudicial, and that the trial court thus erred in admitting them into evidence. The photographs show Mitchell's head and torso from various angles and depict the numerous injuries he sustained, including cuts and bleeding, bruising, and broken teeth. They also depict the effects of decomposition on Mitchell's body, including bloating and skin discoloration.

As a general rule, photographs of a gruesome or graphic nature are not rendered inadmissible solely because of their gruesomeness. *See Funk v. Commonwealth*, 842 S.W.2d 476, 479 (Ky. 1992). But, as this Court recently made clear, trial courts are not free to apply this general rule blindly to automatically admit all gruesome photos offered. Instead, "in all cases in which visual media showing gruesome or repulsive depictions of victims are sought to be introduced over objection, ... the trial court must conduct the Rule 403 balancing test to determine the admissibility of the proffered evidence." *Hall v. Commonwealth*, 468 S.W.3d 814, 823 (Ky. 2015). That is, the trial court must "weigh the probative value of the gruesome photo in question against the harmful effects that might flow from its admission to determine whether the photo should be excluded notwithstanding the general rule." *Id.*

In measuring the probative value of the photographs in question, the court must consider each photograph "within the full evidentiary context of the case, giving due regard to other evidence admitted as well as evidentiary alternatives, so as to ascertain each item's 'marginal' or 'incremental' probative worth for purposes of weighing that value against the risk of prejudice posed by the evidence." *Id.* at 824. And to keep out relevant yet gruesome evidence, "the gruesomeness must be such that it creates substantial undue prejudice or

16

other harmful consequences that outweigh the probativeness of the evidence." *Id.* The key to understanding at what point the balance between probative value and undue prejudice is upended, such that additional gruesome evidence should be excluded, is to recognize the inverse relationship that exists between the two concepts: "[t]hat is, as the jury is confronted with gory image after gory image, the inflammatory and prejudicial effect of the images as a whole increases, while the marginal probativeness of each new image is less than the one before." *Id.* at 826.

Ragland's trial admittedly predated this Court's clarification of the law in *Hall.* But even applying the principles and analytical framework that *Hall* laid out, it is clear that the trial judge acted within his discretion in admitting the eight photos at issue here.

First, there is no doubt that these photographs were relevant and highly probative of the nature of the deceased victim's injuries. The images were specifically used by the medical examiner, during his testimony, to illustrate the various types and degrees of Mitchell's injuries and to explain the likely mechanisms of injury and causes of death. Furthermore, the photos were much more probative of the nature of the fatal injuries than other evidentiary alternatives, which included the medical examiner's rudimentary sketches diagramming the locations and relative sizes of Mitchell's various injuries, the medical examiner's bare oral testimony, periodic glimpses of Mitchell's corpse seen on a video of the crime scene, and blood-spatter evidence in the closet showing six distinct impacts. This evidence was far less probative of the extent and nature of Mitchell's fatal injuries. Without the photographs, the

17

Commonwealth's ability to prove the nature of this grisly crime would have been substantially diminished. And the gruesome photographs were not excessive. Again, only eight graphic images were introduced, and none of them were duplicative or otherwise needlessly cumulative.[6]

As to prejudice, while the general gruesomeness of these photographs inherently presents some danger of prejudice, we do not view them as being so inflammatory as to outweigh their high probative worth, let alone substantially outweigh that probativeness. With the exception of the evidence of decomposition apparent in the images (bloating and discoloration, which the medical examiner made a point of differentiating from the effects of the injuries), the photos do not contain any particularly repulsive or otherwise noteworthy imagery to distinguish them from other similarly grisly images of deceased victims routinely admitted to prove the *corpus delicti* or for some other purpose. We certainly do not believe these eight photographs are so exceptionally gruesome and inflammatory that their exclusion should be required in spite of the general rule favoring inclusion, particularly in light of their substantial probative worth. These photographs are just the sort of admissible evidence to which the general rule of inclusion of graphic photos should apply. After all, as this Court has often repeated, "[w]ere the rule otherwise, the state would be precluded from proving the commission of a crime that is by nature heinous and repulsive." *Ratliff v. Commonwealth*, 194

---

[6] In fact, the trial court partially sustained Ragland's objection to the Commonwealth's proffer of crime-scene and autopsy photographs as to Exhibits 57 and 61, finding that they were needlessly repetitious of other photographs introduced.

S.W.3d 258, 271 (Ky. 2006) (quoting *Salisbury v. Commonwealth*, 417 S.W.2d 244, 246 (Ky. 1967)).

However, Ragland contends that *Clark v. Commonwealth*, 833 S.W.2d 793 (Ky. 1992), a case also involving images of a partially decomposed body, mandated excluding the complained-of images. But *Clark* was rendered prior to the passage of our current Rules of Evidence, and its analysis of the admissibility of the images and video at issue in that case is not entirely consistent with the analytical framework now required by KRE 403. And, in overturning the lower court's ruling on admissibility of gory images, it is largely an outlier in our case law. *Cf. Hall*, 468 S.W.3d at 827. Additionally, the split nature of the four-to-three reversal in *Clark*, a death-penalty case, further cautions against assigning its holdings[7] too much weight going forward. Accordingly, this Court declines Ragland's invitation to extend *Clark*'s pre-Rules analysis and holding to the photographs at issue in this case.

In sum, the decision to admit the eight crime-scene and autopsy photographs at issue was within the judge's discretion. They are highly probative of the type and extent of injuries inflicted upon Mitchell, facts which

---

[7] Writing for the majority of the Court, Special Justice O'Daniel found that four separate and distinct errors each apparently required reversing the defendant's convictions and death sentence: (1) that gruesome color slides and a video of the crime scene should not have been admitted because they were unnecessary to show the victim's injuries and were inflammatory and served to arouse juror's passions, *Clark*, 833 S.W.2d at 794–95; (2) that evidence of prior, unrelated criminal or violent acts by the defendant was more prejudicial than probative and, thus, erroneously admitted, *id.* at 795; (3) that statements made by the prosecutor improperly minimized the jury's sense of responsibility for determining the appropriateness of imposing a death sentence, *id.* at 795–96; and (4) that evidence praising the victim's character during the guilt phase, and the prosecutor's exploitation of the impact of the victim's disappearance on his family, was inflammatory and undermined the defendant's right to a fair trial, *id.* at 796–97.

19

are of particular importance to the jury's consideration of Ragland's claim of self-defense. And although they depict the victim's battered and decomposed corpse, they are not so inflammatory that their probative value is so substantially outweighed by their prejudicial effect as to require exclusion. On remand, the trial court may again, in its discretion, admit these photographs.

## D. Hearsay statement by the victim about "playing house" with the defendant should not have been admitted.

Ragland next claims that the trial court erred in allowing a friend of Mitchell, Jennifer Preston, to testify that Mitchell had introduced her to Ragland with the statement, "This is the guy I play house with." Preston testified that Ragland was present when Mitchell made this statement and that he said nothing in response. Ragland now argues that this testimony was unreliable and inadmissible hearsay and, specifically, that the trial court erred in finding that it was admissible as an adoptive admission under KRE 801A(b)(2).

To begin, no one has disputed that Preston's testimony about Mitchell's statement was hearsay—that is, an out-of-court statement offered to prove the truth of the matter asserted, KRE 801(c)—and was thus inadmissible under KRE 802, unless it satisfied one of the specific hearsay exceptions provided in the rules. Nonetheless, the trial court admitted the statement under KRE 801A(b)(2) as an adoptive admission by Ragland because he was present when it was made and did not deny it.

KRE 801A(b)(2) provides that "[a] statement is not excluded by the hearsay rule ... if the statement is offered against a party and is ... [a]

statement of which the party has manifested an adoption or belief in its truth." This rule encompasses both express adoptive admissions and adoptive admissions implied through acquiescence, which in a few narrow circumstances may include silence. *See Smith v. Commonwealth*, 366 S.W.2d 902, 905 (Ky. 1962) ("The implication of admission by silence rests upon the idea of acquiescence and does not apply unless an acquiescence in what is said can be presumed."). That is, the declarant's out-of-court statement may be admitted in the face of a party's (here, Ragland's) silence whenever such silence itself "manifested an adoption or belief in its truth," KRE 801A(b)(2), in light of the nature of the out-of-court statement and the circumstances in which it was made.

Because KRE 801A(b)(2) has at its core the non-speaking party's manifestation of an adoption or belief in the truth of the declarant's statement, a party's mere presence when the statement is made is insufficient to trigger this hearsay exception. *Perdue v. Commonwealth*, 916 S.W.2d 148, 158 (Ky. 1995). Instead, a party's passivity or silence will only qualify as an adoptive admission if it was maintained in response to "statements that would normally evoke denial by the party if untrue." Robert. G. Lawson, *Kentucky Evidence Law Handbook* § 8.20[3][b], at 597 (5th ed. 2013). Furthermore, "[a] statement may not be admitted as an adoptive admission unless it is established that the party heard and understood the statement and remained silent." *Commonwealth v. Buford*, 197 S.W.3d 66, 73 (Ky. 2006). But "[s]ilence with respect to a statement will always have some ambiguity," Lawson, *supra*, § 8.20[3][b], at 597, so "trial judges should guard against any possible abuse

21

and hold the admissibility of such evidence to exacting standards," *Buford*, 197 S.W.3d at 75. As this Court aptly noted over a century ago:

> Acquiescence, to have the effect of an admission, must exhibit some act of the mind, and amount to voluntary demeanor or conduct of the party. And whether it is acquiescence in the conduct or in the language of others, it must plainly appear that such conduct was fully known, or the language fully understood by the party, before any inference can be drawn from his passiveness or silence.

*Merriweather v. Commonwealth*, 82 S.W.2d 592, 594 (Ky. 1904) (quoting Greenleaf on Evidence § 197).

Ragland argues on appeal that Mitchell's "play house" statement, and the circumstances in which it was made, do not satisfy the conditions necessary for his failure to respond to the statement to operate as a tacit admission of its truth. More specifically, he argues that because the hearsay statement was not incriminating, it does not satisfy the requirement that the statement made be one that would normally prompt a denial by the accused if untrue. That is, his position appears to essentially be that only hearsay statements that incriminate the listener (the defendant) or accuse him of criminal behavior may be impliedly adopted through silence under KRE 801A(b)(2).

The Commonwealth counters that Ragland has interpreted the exception too narrowly in restricting it only to incriminating statements, and that adoptive admissions through silence may instead apply more broadly to any undefined statement made in a party's presence that the party would be expected to deny if untrue. While we agree with the Commonwealth that adoptive admissions are not necessarily limited to statements that are *per se* incriminating or accuse the party of criminal behavior, we disagree with the

22

Commonwealth's contention that the "play house" statement by Mitchell in this case was the type of statement that would normally evoke denial if untrue.

Instead, the "play house" hearsay fails as such a statement because, at most, it merely implied that Mitchell and Ragland had been in a romantic homosexual relationship, a charge that was in no way accusatory or incriminating or otherwise made in such circumstances that would normally evoke denial if untrue.

Of course, it may be tempting now to expect that Ragland would have vehemently denied the implications of that statement given that he did essentially that in subsequent interviews with police and in his testimony at trial. The present negative perception of Ragland's silence in the face of Mitchell's statement identifying Ragland as "the guy [Mitchell] play[ed] house with," however, is due solely to the unfortunate events that occurred after the statement was made and led to Ragland being charged with Mitchell's murder.

But the circumstances that would normally evoke denial if a statement is untrue cannot be those which occur long after the statement is made. Hindsight has no proper part to play in considering whether a statement was made "under such circumstances as would seem to call for [the party's denial] and none is made," such that the party's silence can be considered to have "impliedly ratified and adopted [such statement] as his own." *Griffith*, 63 S.W.2d at 596. Instead, that determination should be made with consideration of the contemporaneous circumstances surrounding the making of the statement and the silent response to it.

23

And Ragland is correct that the "play house" statement was ambiguous as to what Mitchell may have meant when he said it. There are a number of different ways the statement could be interpreted, some leading to the conclusion that a romantic or sexual relationship had existed between the two men and some leading nowhere near such a conclusion. For example, the statement could easily be interpreted as a joke made by an openly gay man to his heterosexual friend. If the statement truly was nothing more than one friend ribbing another (intended, perhaps, to embarrass the heterosexual friend precisely when he is being introduced to a new female acquaintance), then the untrue jest would hardly be expected to evoke denial, or at least a serious denial made outside the context of the jest.

Due to this ambiguity—not to mention the inherently ambiguous and unreliable nature of attributing meaning to silence in general—there is no way to conclude with any reliable degree of certainty that Ragland actually adopted through silence the Commonwealth's interpretation of Mitchell's statement (that he and Ragland were a couple) by apparently failing to react in any way when the statement was made.

This Court finds that evidence of Mitchell's "play house" statement is hearsay that should not have been admitted because it did not meet the criteria of any of the exceptions to the hearsay rule. Specifically, the statement is not one that would normally be expected to evoke a denial if untrue. Therefore, Ragland's silence was not an adoptive admission of the statement under KRE 801A(b)(2), and thus it should be excluded if offered on retrial.

## E. Admissibility of character evidence of the victim.

Next, Ragland argues that the trial court erroneously excluded evidence showing various character traits of the victim. Specifically, he contends that he should have been permitted to put on testimony about Mitchell's criminal history, specifically his prior armed-robbery convictions and parole status; his being HIV positive; and his habit of buying food and clothing for men he met at the Hope Center to purchase sexual favors. Ragland argues, broadly, that all of this evidence was relevant to his self-defense claim and to proving that the victim was the first aggressor, and that the exclusion of this evidence violated his right to put on a full defense. We address each item of evidence in turn.

### 1. Evidence of the victim's prior criminal history and parole status.

Ragland first claims that he should have been permitted to put on testimony about Mitchell's violent criminal history. This included testimony from two witnesses: Detective Robert Wilson would have testified that Mitchell had previously robbed gas stations using a knife and was convicted of first-degree robbery; and Jackie Miller would have testified that Mitchell was on parole because he and another person had robbed six or seven Shell stations in Fayette County. Ragland argues that he was entitled to introduce this testimony because he had been charged with a homicide and claimed self-defense and, therefore, Mitchell's character for violence was a "pertinent trait of character of the victim of the crime," KRE 404(2)(a), which is admissible if offered by the accused.

25

It is true that evidence of a victim's violent character is typically relevant, and therefore admissible, in self-defense cases because it supports the defendant's claim that the victim was, in fact, the first aggressor. *See* KRE 404(a)(2); *Saylor v. Commonwealth*, 144 S.W.3d 812, 815 (Ky. 2004). But where Ragland's argument fails is in ignoring the permissible methods of proving character as laid out in KRE 405. That is, with only limited exceptions not applicable here,[8] "[i]n all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to *general reputation* in the community or by testimony in the form of *opinion.*" KRE 405(a) (emphasis added). So, for example, there is no doubt that testimony from Miller that Mitchell was generally reputed to be a violent person in their group of friends, or that it was her opinion based on her experiences with him that he was a violent person, would have been admissible to prove Mitchell's character for violence.

The evidence Ragland wanted admitted, however, was not general reputation or opinion testimony. Instead, it was evidence of specific instances of conduct by Mitchell offered to show that he was a violent person and that he acted in conformity with that violent character in this instance, which is, of course, a prohibited use of other-bad-acts evidence under KRE 404(b). The trial court committed no error in excluding the evidence on those grounds.

---

[8] The exceptions are provided in KRE 405(b) (allowing for inquiry, on cross-examination, into whether the character witness knows about or has heard of relevant specific instances of conduct) and KRE 405(c) (allowing for proof of specific instances of a person's conduct whenever the person's character or a trait of character "is an essential element of a charge, claim, or defense").

26

Nonetheless, in self-defense cases, a victim's prior violent acts may also be admitted for another, non-character purpose: as proof of the defendant's fear of the victim. In that case, evidence of the prior violent act is not being used to prove the victim's violent character (and, in turn, that the victim was the initial aggressor), but instead is being used to prove the defendant's state of mind (fear of the victim) at the time he believed that physical force was needed to protect himself against the victim's aggression. *Saylor*, 144 S.W.3d at 815–16. But for such evidence to be relevant and admissible for this purpose, the defendant must have known of the victim's prior bad acts at the time he purportedly acted in self-defense. *Baze v. Commonwealth*, 965 S.W.2d 817, 824–25 (Ky. 1997). It should go without saying that a defendant's fear of being physically harmed by another cannot have been influenced by violent acts that the defendant knew nothing about.

It does not appear that Ragland ever demonstrated (or even claimed) that he knew of Mitchell's prior robberies or parole status at the time of their encounter on December 22, 2010. In the absence of such a showing on retrial, that evidence should again be excluded as barred by KRE 404(b).

## 2. Testimony that the victim was known to be HIV positive.

Ragland also contends that he was erroneously prevented from questioning Jackie Miller about her general knowledge that Mitchell was HIV positive. Miller testified by avowal that for years it had been generally known, or at least rumored, that Mitchell had HIV or AIDS.[9] Ragland wanted to

---

[9] The Commonwealth stipulated at trial that Mitchell was, in fact, HIV positive.

introduce this testimony as support for his claim that his reaction to Mitchell's unwanted advances was driven, at least in part, by his fear of contracting HIV. Because the jury's acceptance of that claim turned on whether he had himself known about Mitchell's HIV status at the time of the encounter, Ragland argues, Miller's testimony was relevant because it tended to show that he too had possessed such knowledge prior to the encounter on December 22.

As previously discussed, Ragland's state of mind (fear) at the time that he claims Mitchell was attempting to forcibly compel sex was relevant to his self-defense claim. Just as with evidence of prior acts of violence, evidence of a victim's HIV-positive status may be admitted for the purpose of showing the defendant's fear of the victim and his belief that physical force was necessary to protect against possible contraction of the disease as a result of the victim's sexual aggressions. But, again, such evidence is relevant for that purpose only if the defendant knew of that status at the time of the encounter.

In contrast to Mitchell's criminal history, Ragland claimed at trial that he had known about (and feared) Mitchell's HIV at the time of their altercation. Therefore, assuming Ragland again demonstrates on remand that he had known that Mitchell was HIV-positive prior to their fight, Miller's testimony that Mitchell's HIV status had been generally known in the community will be relevant and admissible to support his claim on retrial.

### 3. Testimony about victim's habit of trading food and clothing for sex.

Last, Ragland claims that he should have been permitted to introduce testimony from Sergeant David Richardson that Mitchell had a history of

28

buying food and clothing for men he met at the Hope Center in exchange for sexual favors. As with the evidence analyzed in the previous two discussions, Ragland argues that he had a right to present this testimony as evidence of a pertinent trait of character of the victim under KRE 402(a)(2). He contends that this evidence showed that Mitchell had targeted and pursued Ragland when they met at the Hope Center, which was consistent with his character for luring potential sexual partners at the shelter with offers of food or clothing (or perhaps drugs) and, thus, supported his claim that Mitchell was the first aggressor.

Whether this evidence should be admitted on retrial is subject to the trial court's discretion based on the principals elucidated above with respect to proving the character of the victim as the initial aggressor under KRE 404 and 405. We reiterate that specific acts of conduct by the victim—here, Mitchell's past exchanges of food and clothing for sexual favors—are inadmissible to prove action in conformity with such acts. However, it may also be true, depending on how the evidence is introduced and fleshed out on retrial, that such evidence may be admissible for some "other purpose" under KRE 404(b)— such as to prove the modus operandi of the alleged victim-aggressor, *see, e.g.,* *Clark v. Commonwealth*, 223 S.W.3d 90, 96–97 (Ky. 2007)—or perhaps as habit evidence under KRE 406 if Ragland can satisfy the requirements for admissibility under that rule. We thus leave the determination of the admissibility of this evidence to the trial court's discretion should it again be offered on retrial.

## III. Conclusion

For the foregoing reasons, the judgment of conviction and sentence of the Fayette Circuit Court is reversed, and this matter is remanded for a new trial consistent with this opinion.

Minton, C.J.; Abramson, Cunningham, Keller, Noble and Venters, JJ., sitting. All concur. Wright, J., not sitting.

COUNSEL FOR APPELLANT:

Susan Jackson Balliet
Assistant Public Advocate
Department of Public Advocacy
200 Fair Oaks Lane, Suite 500
Frankfort, Kentucky 40601

COUNSEL FOR APPELLEE:

Jack Conway
Attorney General

James Hays Lawson
Assistant Attorney General
Office of Criminal Appeals
Office of the Attorney General
1024 Capital Center Drive
Frankfort, Kentucky 40601