# Supreme Court of Kentucky

2019-SC-0306-MR

JUSTIN CURRY                                                  APPELLANT

<table>
<tr><td></td><td>ON APPEAL FROM JEFFERSON CIRCUIT COURT</td></tr>
<tr><td>V.</td><td>HONORABLE MITCHELL PERRY, JUDGE<br>NO. 17-CR-002410</td></tr>
</table>

COMMONWEALTH OF KENTUCKY                         APPELLEE

## ORDER DENYING PETITION FOR REHEARING AND MODIFYING OPINION

The Petition for Rehearing, filed by the Appellant, Justin Curry, of the Opinion of the Court rendered May 28, 2020, is DENIED.

The Opinion of the Court is corrected on its face by substitution of the attached corrected Opinion entered December 17, 2020, in lieu of the original Opinion of the Court. Said correction does not affect the holding of the original Opinion of the Court.

All sitting. All concur.

ENTERED: December 17, 2020.

_____
CHIEF JUSTICE

MODIFIED: DECEMBER 17, 2020
RENDERED: MAY 28, 2020
TO BE PUBLISHED

# Supreme Court of Kentucky

2019-SC-0306-MR

JUSTIN CURRY                                               APPELLANT

|  |  |
|---|---|
| V. | ON APPEAL FROM JEFFERSON CIRCUIT COURT<br>HONORABLE MITCHELL PERRY, JUDGE<br>NO. 17-CR-002410 |

COMMONWEALTH OF KENTUCKY                          APPELLEE

**OPINION OF THE COURT BY JUSTICE LAMBERT**

**<u>AFFIRMING</u>**

Justin Curry was convicted of one count of murder and one count of possession of a firearm by a convicted felon. He was sentenced to life imprisonment after he was found to be a first-degree persistent felony offender. He now appeals his convictions to this Court. After review, and finding no error, we affirm.

## I. FACTUAL BACKGROUND

At the time of the offenses committed in this case, Curry had recently been released from jail and placed in Louisville Metro Department of Corrections' home incarceration program (HIP). HIP enrollees are still considered inmates of Louisville Metro Corrections but are permitted to serve out their sentence at a HIP approved residence rather than in jail. Enrollees

are only allowed to leave their HIP residence with prior approval or in emergency situations. Curry's HIP residence was the apartment of the victim in this case, James Harris. Curry and Harris were life-long friends and considered each other to be family.

The night before the murder several people went to Harris' apartment to hang out, Tierra Coleman was among them. Evidence about the nature of Curry's relationship with Coleman was conflicting. Text messages between the two suggested they were in a romantic relationship and Coleman testified that she was Curry's girlfriend, but Curry denied this. He also denied that Coleman stayed at the apartment that night at his request. Regardless, it was undisputed that there was a no contact order between the two of them at the time due to a domestic violence incident that was not addressed in any detail at trial.

At approximately 8 a.m. on the day of the shooting, Curry texted his mother and asked her to call 911 and have police sent to Harris' apartment. When Officers Marquez Hughes and Benjamin Shelton arrived, Curry told them he wanted to go back to jail. He explained to Ofc. Hughes that one of the people who was at the apartment the night before spilled something in the kitchen, Harris was blaming him for it, and he wanted to leave the apartment. He did not mention the no contact order between himself and Coleman. Ofc. Hughes testified that Curry's demeanor was calm, and that he did not sense any potential danger at the scene. Ofc. Shelton spoke to Coleman and Harris, and testified Harris was relaxed.

2

Ofc. Hughes told Curry that they could not take him to jail because he had not committed a crime. But he contacted Curry's assigned HIP officer, Officer Wes Prebeck, to try to remedy the situation. Curry was instructed to either call the HIP office or go to the HIP office to change his HIP address. The officers left the scene, and Coleman left shortly after them. Curry never contacted the HIP office that day.

Later that morning Curry began texting another one of his friends, Arthur Simpson. The relevant portions of those texts read:[1]

> **CURRY:** I need you to go to my mom's and bring me something.
>
> **CURRY:** If anybody ask you coming to use.
>
> **CURRY:** I need that thing over here ASAP and show her the right ones that go in.
>
> **SIMPSON:** Where's it at, Fam?
>
> **CURRY:** Mom.
>
> **SIMPSON:** You want me to get it now?
>
> **CURRY:** Yeah, if you can.
>
> **CURRY:** Show which one goes.
>
> **SIMPSON:** What?
>
> **CURRY:** Bullets.
>
> **CURRY:** I need 9.

---

[1] The record submitted to us on appeal does not contain copies of the photographs of the text messages. We are therefore using the Commonwealth's restatement of the texts from its appellate brief, as it was the only party to provide them. The Commonwealth acknowledges its restatement is not verbatim.

The Commonwealth theorized that Curry was asking Simpson to bring Curry's 9mm handgun from his mother's home, and to make sure that Simpson got the right kind of bullets for the gun. Curry, who testified on his own behalf, said that he did not know what he meant by the texts. Simpson testified[2] that he brought Curry a bag with underclothes and a belt in it from Curry's mother's house, but the bag did not contain a gun. Simpson told Detective Jody Speaks in a recorded interview shortly after the shooting that when he arrived at the apartment to give Curry the bag, Curry did not have a gun. Simpson then went to the store to get some things for Curry, and when he arrived back at the apartment Curry had a 9mm pistol tucked in his waistband.

Curry testified to the following regarding Harris' death: shortly after 10:40 that evening, Curry and Harris were the only people in the apartment. Curry said Harris "started talking crazy to him" and getting aggressive. Curry was scared of Harris and did not know what to do, and Harris started coming towards him. Curry looked down and saw a gun on the couch he was sitting on; he picked up the gun and shot Harris. He did not know how many times he fired the gun or how many times he hit Harris. Curry said he did not know where the gun came from and it was not his. He called 911 immediately.

The forensic evidence demonstrated that Curry fired eight rounds from a Taurus 9mm pistol. Three of the rounds struck Harris: one round went in his

---

[2] It should be noted that Simpson was a hostile witness and refused to swear that his testimony would be the truth prior to testifying.

back and out his armpit, one hit his left thigh and fragmented, and one entered through his forehead and exited through the back of his head. The medical examiner testified that the shot to the head would have been immediately incapacitating. A firearms expert testified that, based on the absence of a gunshot residue pattern on Harris' shirt, it was unlikely the shots were fired any closer than two and a half feet away. Finally, Detective Jody Speaks found pieces of Harris' brain matter on the floor near his body, which he testified was consistent with the shot to his head being fired while he was lying on the floor.

Based on the foregoing, the jury convicted Curry of murder and of being a convicted felon in possession of a firearm. He was later found to be a first-degree persistent felony offender and was sentenced to life imprisonment.

Additional facts are discussed below as necessary.

## II.    ANALYSIS

Curry asserts two arguments on appeal. First, he alleges the trial court erred by denying his request for a "no duty to retreat" jury instruction. He also contends that the trial court erred by failing to strike two jurors for cause. We will address each argument in turn.

### A. No duty to retreat instruction

Curry's first argument on appeal is that the trial court erred by failing to give the jury a no duty to retreat instruction. This argument was properly

preserved by Curry's tender of an instruction on no duty to retreat.[3]  We review a trial court's ruling regarding jury instructions for abuse of discretion.[4]  A trial court abuses its discretion when it rules in a way that is arbitrary, unreasonable, unfair, or unsupported by sound legal principles.[5]

While we otherwise agree that the evidence presented at trial warranted a no duty to retreat instruction, Curry was not entitled to that instruction because he was engaged in an unlawful activity when he shot Harris.

To begin, although it is not dispositive of this issue, we believe it is important to address whether the evidence, standing alone, warranted a no duty to retreat instruction, as our case law in this area is fairly scant.

Kentucky's codification of a criminal defendant's right to stand his or her ground is found in KRS[6] 503.055(3), which states:

> A person who is not engaged in an unlawful activity and who is attacked in any other place where he or she has a right to be has no duty to retreat and has the right to stand his or her ground and meet force with force, including deadly force, if he or she reasonably believes it is necessary to do so to prevent death or great bodily harm to himself or herself or another or to prevent the commission of a felony involving the use of force.

The first case to address this codification was *Commonwealth v. Hasch*, which ultimately held:

---

[3] Kentucky Rule of Criminal Procedure (RCr) 9.54(2).

[4] *Ratliff v. Commonwealth*, 194 S.W.3d 258, 274 (Ky. 2006).

[5] *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

[6] Kentucky Revised Statute.

6

> [t]herefore, in light of the enactment of KRS 503.055 and KRS 503.050(4),[7] we now agree that when presented with circumstances in which the provisions of those statutes are applicable, and upon the request of one of the parties, the trial court must include among the jury instructions, a "no duty to retreat" instruction[.][8]

Two years later, in *Ragland v. Commonwealth*[9] we expounded upon and clarified our holding in *Hasch*. In *Ragland*, the trial court gave the jury a no duty to retreat instruction in addition to an instruction on self-defense.[10] On appeal to this Court, Ragland argued that it was reversible error for the trial court to do so because the no duty to retreat instruction "introduced several factors and conditions that did not apply under the facts of [the] case and, instead, served only to confuse the jury and prevent them from properly considering his defense."[11] The Commonwealth argued that the instruction was proper because "it was almost identical to the language this Court expressly approved in *Commonwealth v. Hasch*."[12]

To address these arguments, this Court began by making it clear that the fact that a criminal defendant is entitled to a jury instruction on self-defense

---

[7] KRS 503.050(4) provides simply that "[a] person does not have a duty to retreat prior to the use of deadly physical force."

[8] 421 S.W.3d 349 (Ky. 2013).

[9] 476 S.W.3d 236 (Ky. 2015).

[10] *Id.*, at 243.

[11] *Id.*

[12] *Id.*

does not automatically entitle him to an additional instruction on no duty to retreat.[13] Specifically,

> it is only in such situations where evidence of an apparent means of retreat is so intertwined in the evidence in the case that the trial court should give an appropriate no-duty-to-retreat instruction based on KRS 503.055(3). This is because so doing prevents the jury from improperly considering the available means of retreat, or the defendant's knowledge of the available means, as evidence that the use of force was not reasonably necessary or that the defendant did not subjectively believe that the use force was necessary. But when there is no such risk, because the jury is not presented with any such evidence to improperly consider, there is no need to give the instruction.[14]

We ultimately concluded that it was reversible error for the trial court to instruct the jury on no duty to retreat because

> [n]one of the circumstances surrounding the incident at [the victim's] apartment suggested that Ragland had an available route for retreat, or other opportunity to altogether avoid the confrontation and his violent response, that could have otherwise created a risk that the jury w[ould] be misdirected to give it improper consideration.[15]

In this case, we are presented with the inverse situation to that of *Ragland*; Curry wanted an instruction on no duty to retreat and the trial court declined to give it. However, our analysis of the issue remains the same. Whether Curry would have otherwise been entitled to a no duty to retreat instruction had he not been engaged in an unlawful activity at the time of the

---

[13] *Id.*, at 244.

[14] *Id.* (internal citations and quotation marks omitted).

[15] *Id.* (internal quotation marks omitted).

shooting still revolves around one question. That is, whether there was evidence of an available route for retreat or other opportunity to altogether avoid the confrontation that was so intertwined in the evidence that it makes it more logical to give a no duty to retreat instruction because the jury might have improperly considered the means of retreat as evidence that Curry's use of force was not reasonably necessary or that Curry did not subjectively believe that use of force was necessary. We believe it was.

The "opportunity to avoid the confrontation" with Harris that Curry had in this case was his chance to get his HIP residence changed on the morning of the shooting. This fact was discussed numerous times throughout both the Commonwealth and the defense's case-in-chief.

In the Commonwealth's opening statement, it mentioned that Curry was directed to contact Ofc. Prebeck that morning and failed to do so. Ofc. Hughes later testified that he told Ofc. Prebeck that Curry was afraid of violating the rules of his HIP agreement if he stayed at Harris' apartment and wanted to get his HIP address changed. Ofc. Hughes testified that Ofc. Prebeck told him Curry could "absolutely" do that, and all Curry needed to do was contact the HIP office.

Ofc. Prebeck himself also testified. According to Prebeck, a HIP enrollee does not need a court order to get his HIP address changed, that it is at the discretion of their assigned HIP officer. He further noted that, even if Curry could not be placed at an address he requested because of HIP's rules, he had the option to be returned to jail. Ofc. Prebeck testified that he intended to

9

discuss all of Curry's options with him that day, but Curry never tried to contact him. During cross-examination of Ofc. Prebeck, the defense asked whether being in violation of a no contact order was a criminal offense, and Ofc. Prebeck responded that it was. Because of this, the jury could discern that Curry had another possible means of leaving the apartment that morning: if he would have told the officers about the no contact order between himself and Coleman, they would have had grounds to take him to jail, which was what Curry initially told them he wanted.

Finally, during the Commonwealth's cross-examination of Curry, counsel specifically stated, "you had opportunities to get out [of the apartment] and you didn't go." The Commonwealth first discussed how Curry had at least twenty dollars in his pocket that morning based on Ofc. Hughes' body cam footage of Curry's person being searched. Based on this, she suggested he could have called a taxi, but did not. Counsel also noted that Curry had at least two people, Coleman and Simpson, bring him things like clothing, food, and cigarettes, and that either one of them could have taken him to the HIP office but he did not ask them to. The Commonwealth again noted Curry's failure to contact the HIP office that day in its closing argument.

We believe that the unfolding of these facts was so interwoven with the evidence against Curry that it created a risk that the jury would improperly consider his failure to have his HIP address changed when he had the ability to as evidence that his use of deadly force was not reasonably necessary or that he did not subjectively believe that the use deadly force was necessary.

10

However, because of clear statutory language, we hold that the trial court did not abuse its discretion by declining to give the jury a no duty to retreat instruction because it correctly found that Curry was engaged in an unlawful activity at the time of the shooting.

As previously mentioned, KRS 503.055(3) requires both that a defendant is "not engaged in unlawful activity" and "is attacked in any other place where he or she has a right to be" before the provisions of that statute apply. While Curry was lawfully in Harris' apartment, the trial court declined to give Curry a no duty to retreat instruction because it found that he was a convicted felon in possession of a firearm, which is unlawful under Kentucky law.[16] Curry argues that the trial court's ruling was reversible error for two reasons, each of which we will address in turn.

Curry first asserts that possessing a firearm is not an inherently unlawful activity, and it is only his status as a convicted felon that made it unlawful. By that standard, he reasons, a person who possessed a firearm and used it while acting in self-defense is entitled to a no duty to retreat jury instruction, while an otherwise identically situated convicted felon is not. Curry essentially advocates for an exception to the no duty to retreat statute that would allow juries to be instructed as to no duty to retreat even if the defendant was a convicted felon in possession of a firearm.

But as we have discussed, Kentucky's no duty to retreat rule is a creature of statute. Creating exceptions to clearly worded statutes is not

---

[16] *See* KRS 527.040.

11

within the province of this Court: "[w]here a statute is plain and unambiguous on its face, we are not at liberty to construe the language otherwise[.]"[17] KRS 503.055(3) could not be more clear that a defendant is not entitled to a no duty to retreat instruction if they are engaged in unlawful activity. And KRS 527.040 provides that being a convicted felon in possession of a firearm is either a Class C or Class D felony. Therefore, we hold that being a felon in possession of a firearm is an unlawful activity for the purposes of determining a defendant's entitlement to a no duty to retreat instruction.[18]

We acknowledge the angst as expressed in the separate concurring opinion that this holding, at first glance, may seem like cause for concern. However, we believe that opinion conflates the circumstances necessitating a self-defense instruction and those necessitating a no duty to retreat instruction. Again, simply because a defendant is entitled to a self-defense instruction does not automatically entitle him to an additional instruction on no duty to retreat.

In the hypothetical, a situation is presented where "a felon is inside his home. There are no guns inside of the home, and he is not otherwise engaged in any illegal activity. A burglar breaks into his home, armed with a firearm. The homeowner/felon is able to disarm the intruder and shoots him while defending himself and his home." Under these facts, assuming the

---

[17] *Pennyrile Allied Cmty. Servs., Inc. v. Rogers*, 459 S.W.3d 339, 343 (Ky. 2015).

[18] We also note that, in addition to the right to bear arms, many other constitutionally protected rights are taken away when an individual is convicted of a felony such as the right to hold office (Ky. Const. § 150), the right to vote (Ky. Const. § 145), and the right to serve on a jury (KRS 29A.080).

12

requirements of KRS 503.050 are met, the homeowner would most certainly be entitled to an instruction on self-defense, or possibly a choice of evils instruction under KRS 503.030. However, the homeowner would not be entitled to a jury instruction on no duty to retreat regardless of whether or not he was a convicted felon. This is because the evidence, presumably, would not include an apparent means for the homeowner to retreat that was so entwined in the evidence that it would cause the jury to give it improper consideration of the homeowner's mental state. The homeowner, in all likelihood, could not have foreseen his home being burglarized, let alone have an opportunity to leave the home prior to the break in to avoid shooting the burglar. Therefore, regardless of his potential felon status, a no duty to retreat instruction would not be proper.

Curry next argues in the alternative that, even assuming *arguendo* for the purposes of a no duty to retreat instruction that a convicted felon is engaging in an unlawful activity by possessing a handgun, the evidence was conflicting as to exactly when he began "possessing" the gun. Therefore, he argues, whether he was in possession of the gun prior to the victim allegedly attacking him should have been a factual determination for the jury. We disagree.

The Commonwealth's theory of the case was that Curry asked Simpson to bring him a 9mm from Curry's mother's home, and that it was the same 9mm he used to shoot Harris. Curry claimed that the gun he used to shoot Harris was not his, that he did not have a gun that day, and that it was not

13

until Harris charged him that he looked down and saw a gun on the couch, which he picked up and fired. But, even assuming Curry's version of events to be true, the second he picked up the handgun he became a felon in possession of a handgun. This means that, while he was entitled to an instruction on self-defense, which the jury was instructed on, he was not entitled to a stand your ground instruction because he was engaged in an unlawful activity. There was therefore no reason to submit that factual determination to the jury, and the trial court did not abuse its discretion in declining to do so.

## B. Failure to strike jurors for cause

Curry next argues that the trial court erred by failing to strike two jurors, Juror 5 and Juror 50,[19] for cause.[20] This alleged error was properly preserved for appellate review: Curry moved the court to strike Jurors 5, 50, and 30[21] for cause, and his motions were denied. He then exercised peremptory strikes on Jurors 5, 50, and 30, and exhausted his remaining peremptory strikes. Next, Curry identified on his strike sheet three jurors he would have struck for cause had he not been forced to use them on Jurors 5, 50, and 30.[22] One of the

---

[19] Presumably for the sake of simplicity, both parties refer to the jurors by their seat numbers rather than their juror numbers: 2151623 and 2325391, respectively.

[20] A criminal defendant's right to an impartial jury is safeguarded by both Section 11 of the Kentucky Constitution and the Sixth and Fourteenth Amendments to the United States Constitution.

[21] The trial court's failure to strike Juror 30 is not at issue in this appeal.

[22] *Gabbard v. Commonwealth,* 297 S.W.3d 844, 854 (Ky. 2009).

jurors that he would have otherwise exercised a peremptory strike on ultimately sat on the jury.[23] [24]

This Court reviews a trial court's alleged error of failing to strike a juror for cause for abuse of discretion.[25] A trial court abuses its discretion when it acts in a way that is arbitrary, unreasonable, unfair, or unsupported by sound legal principles.[26] With the foregoing principles in mind, we will address the arguments against each juror.

**Juror 5**

Curry asserts that Juror 5 was impermissibly biased in favor of law enforcement based on the following portion of her voir dire:

> **DEFENSE:** So I know the Commonwealth had asked you before people who were, friends and family in law enforcement, can I see those hands again? People who have close friends and family. (speaking to Juror 5) Ma'am could you tell me what they do, where they work for?
>
> **JUROR 5:** My stepdad raised me, growing up he was chief of police of our town in Pennsylvania, not here.
>
> **DEFENSE:** What kinds of things was he investigating?

---

[23] *King v. Commonwealth*, 276 S.W.3d 270, 279 (Ky. 2009).

[24] We further note that, although Curry's trial took place before this Court's recent holdings in *Floyd v. Neal*, 590 S.W.3d 245 (Ky. 2019) and *Ward v. Commonwealth*, 587 S.W.3d 312 (Ky. 2019), and is therefore not subject to their authority, Curry nonetheless also complied with their holdings regarding preservation of this issue.

[25] *Pendleton v. Commonwealth*, 83 S.W.3d 522, 527 (Ky. 2002) ("[A] determination as to whether to exclude a juror for cause lies within the sound discretion of the trial court, and unless the action of the trial court is an abuse of discretion or is clearly erroneous, an appellate court will not reverse the trial court's determination.").

[26] *English*, 993 S.W.2d at 945.

15

**JUROR 5:** He was on their on-call team, so I mean he did every aspect of it, a lot of the detective type stuff, a lot of the on-call response team stuff. He got called in the middle of the night to go investigate murders.

**DEFENSE:** So you were kind of pretty close to seeing what that experience was like?

**JUROR 5:** Yeah.

**DEFENSE:** Did you kind of form an opinion about the work he was doing?

**JUROR 5:** I think so, yeah.

**DEFENSE:** Did you meet his friends and colleagues and that sort of thing?

**JUROR 5:** Yeah.

**DEFENSE:** Okay, and do you think that kind of made you trust people in that occupation more?

**JUROR 5:** Yeah.

Curry contends that this line of questioning required Juror 5 to be struck for cause in accordance with RCr 9.36(1), which requires that a juror be struck when "there is reasonable ground to believe that [the] prospective juror cannot render a fair and impartial verdict on the evidence[.]" More specifically, he maintains that under *Shane v. Commonwealth*,[27] Juror 5's connection to law enforcement mandated that she be struck for cause. We disagree.

In *Shane,* this Court held that the trial court committed reversible error by failing to strike a juror for cause.[28] To reach that conclusion we pointed to

---

[27] 243 S.W.3d 336 (Ky. 2007).

[28] *Id.,* at 338.

16

the juror's unequivocal statements that he, a local police officer himself, "had an inside point of view" regarding law enforcement, was "absolutely pro-police," and, most damning, that "he did not believe [police officers] would lie under oath because they took the oath more seriously" and "he would find it more likely that a police officer was telling the truth than a lay witness."[29] We held that the juror's statements when considered as a whole "indicated a probability that he could not enter the trial giving both sides a level playing field...that a defendant would have little or no chance of challenging an officer's testimony in [the] juror's mind."[30]

In subsequent cases we developed more specific parameters to our holding in *Shane* regarding a potential juror's connection to law enforcement. A succinct restatement of the rule as it now stands is provided in *Brown v. Commonwealth*,[31] which states:

> a close relationship to a police officer does not, standing alone, give rise to a presumptive bias. We have required, rather, such additional evidence of bias as the prospective juror's personal acquaintance with the officers involved in the investigation of the case being tried, or his assertion during voir dire that police officers are less apt than other witnesses to lie because they take their oaths more seriously.[32]

---

[29] *Id.*, at 337.

[30] *Id.*, at 338.

[31] 313 S.W.3d 577 (Ky. 2010).

[32] *Id.*, at 597 (internal citations omitted). *See also, e.g., Fugett v. Commonwealth*, 250 S.W.3d 604, 615 (Ky. 2008) (holding the trial court abused its discretion by failing to strike a juror that indicated he would believe the testimony of a police officer "simply because he was a police officer and because police officers have greater credibility in their testimony than other witnesses.").

17

In this case, Curry has failed to demonstrate any "additional evidence of bias" that Juror 5 may have had in favor of law enforcement. She was never asked to expound on the exact nature of the opinion she formed regarding the work her stepfather did. And while she stated that her experiences made her trust members of law enforcement more in general, at no point does she state that she would favor members of law enforcement in relation to the case or that she would believe the testimony of a police officer over that of a civilian witness. Therefore, there were no reasonable grounds to believe that Juror 5 would be unable to render a fair and impartial verdict on the evidence, and the trial court did not err.

**Juror 50**

Curry's final argument is that Juror 50 should have been struck for cause both because he may have been exposed to information about the case prior to trial and because he had some general knowledge of the criminal justice system from his family members. The relevant portions of his *voir dire* are as follows:

> **COURT:** You indicated that you may remember something now that you've heard some questions. Do you think you have a memory or knowledge of this [case] somehow?
>
> **JUROR 50:** I think there was something dealing with drugs, and he was on home incarceration, and they went out and robbed somebody.
>
> **COURT:** Well I can't confirm or deny what you think [...] here's the real question though, let me just very gently suggest, the news has only an obligation to report, they have no obligation to get it correct.

18

**JUROR 50:** Yes, right.

**COURT:** And you realize they can report anything.

**JUROR 50:** Yes, mhm.

**COURT:** If you were chosen as a juror would you be willing, or could you in fact put whatever, because I don't even know that you're thinking about the right case. Whatever you think you think you've heard, could you put that completely out of your mind and only base a verdict on what you hear in the courtroom and not what you've read or heard?

**JUROR 50:** Yes.

**COURT:** Could you do that?

**JUROR 50:** Right.

**COURT:** Okay, how recently do you think you've heard something about this?

**JUROR 50:** Well, I'm going to say this, I have family members that are pre-trial officers and corrections officers, you know—

**COURT:** They talk.

**JUROR 50:** Right.

**COURT:** Alright, well let me see if the lawyers want to ask you anything.

**DEFENSE:** Do you feel like your experience with pre-trial services gives you any kind of information about the criminal justice system that you wouldn't otherwise know? Like penalty ranges, that kind of thing?

**JUROR 50:** Yes, mhm.

**DEFENSE:** This is, you're just getting information from friends and family?

**JUROR 50:** Well my wife is a—

**COURT:** Your wife is a pre-trial officer?

**JUROR 50:** Yes.

**COURT:** Here in the county?

**JUROR 50:** Yes, she's been here fifteen. My sister retired.

**DEFENSE:** What you're thinking of, is it specifically somebody who had been on HIP or was charged with something and then released? Or what was it that you remember hearing about?

**JUROR 50:** That he was at the time on HIP and went out to do a deal and it went bad or went to rob the person.

**DEFENSE:** Okay.

**COURT:** Anything else?

**DEFENSE:** No.

**COURT:** Alright. Flash all the way forward. Whether you're correct or not, none of us are going to confirm that. My question to you though, if chosen, could you put all of that out of your mind and only render a verdict as to Mr. Curry based on what happens in the courtroom? Could you do that?

**JUROR 50:** Yes.

Regarding Juror 50's possible pre-trial exposure to the case, Curry notes first that the information Juror 50 thought he had about the case was incorrect: this case did not involve a robbery. He goes on to argue that Juror 50's belief that this case involved a robbery may have lingered with him throughout the trial and led him to believe that information was being withheld from the jury. Therefore, he believes there were reasonable grounds to believe

20

Juror 50 could not render a fair and impartial verdict on the evidence presented at trial. We disagree.

It is well-established that "[t]here is no constitutional prohibition against jurors...having knowledge of the case. The Constitution does not require ignorant or uninformed jurors; it requires impartial jurors."[33] Accordingly, in order to have a juror struck for cause based upon his or her pre-trial exposure to information about a case, that information must "engender a predisposition or bias that cannot be put aside."[34] Juror 50 never indicated that he had any pre-conceived notions about the case based on the information he believed he heard. He in fact stated twice that he could put that information out of his mind and render a verdict solely on the evidence presented to him at trial.

Furthermore, we have previously found no error in failing to strike potential jurors who were exposed to more pre-trial information than Juror 50. For example, in *Hodge v. Commonwealth*, the appellant argued that three jurors should have been struck for cause based on their prior knowledge of the case.[35] "Juror No. 63 recognized Appellant's name and the names of several potential witnesses. She also had heard about the case but had not formed an opinion as to Appellant's guilt or innocence," "Juror No. 72 had read about the case and the previous trial but could not recall the outcome. She had not formed an opinion as to Appellant's guilt or innocence," and "Juror No.

---

[33] *Hodge v. Commonwealth*, 17 S.W.3d 824, 838 (Ky. 2000).

[34] *Id.*

[35] *Id.*

73...recognized Appellant's name. She did not know any of the details of the case but had heard it was a 'bad case.'"[36] This Court found no error in failing to strike the aforementioned jurors for cause.[37]

In contrast, the only accurate information Juror 50 had about this case was that Curry was a HIP enrollee. That alone is insufficient to create a presumption that Juror 50 could not render a fair and impartial verdict on the evidence. This is particularly true in light of his unequivocal statements that he could put any pre-trial information he may have received, accurate or not, completely out of his mind. Curry's contention that Juror 50 may have believed information was being withheld from the jury is therefore speculative at best.

Next, Curry contends that Juror 50 should have been struck because he had some information about the criminal justice system due to his wife and sister's involvement in it. The fact that Juror 50 had some knowledge about the inner workings of the criminal justice system in no way suggests that he was unable to render a fair and impartial verdict based on the evidence in Curry's case. The trial court did not err in failing to strike him for cause.

### III. CONCLUSION

Finding no reversible error, we affirm.

All sitting. Minton, C.J.; Hughes and VanMeter, JJ. concur.

---

[36] *Id.*

[37] *Id.*

22

Keller, J., Concurring In Part And Concurring In Result Only In Part:

Although I agree that in this case the trial court did not abuse its discretion in denying Curry's request for a no duty to retreat instruction, I write separately to express my concern with the breadth of the majority's holding on this issue, namely that being a felon in possession of a firearm always prevents a defendant from obtaining a no duty to retreat instruction.

Consider the following factual scenario: A felon is inside his home. There are no guns inside of the home, and he is not otherwise engaged in any illegal activity. A burglar breaks into his home, armed with a firearm. The homeowner/felon, despite having a potential avenue of retreat, is able to disarm the intruder and shoots him while defending himself and his home. Under Kentucky law, the homeowner would not have a duty to retreat, despite having a potential avenue for such, and at trial, I believe that homeowner would be entitled to a no duty to retreat instruction despite technically possessing, at that moment, a firearm after being convicted of a felony.

Accordingly, while I disagree with the majority's broad holding regarding the no duty to retreat instruction, I concur with the result in this case, as the trial court did not abuse its discretion in denying Curry's request for the instruction.

Nickell and Wright, JJ., join.

23

COUNSEL FOR APPELLANT:

Joshua Michael Reho
Leo Gerard Smith
Louisville Metro Public Defender


COUNSEL FOR APPELLEE:

Daniel Jay Cameron
Attorney General of Kentucky

Courtney J. Hightower
Assistant Attorney General